1 | GERARD P. FOX (SBN 151649)
gfox@gerardfoxlaw.com
2 | GERARD FOX LAW P.C.
1880 Century Park East, Suite 1410
3 | Los Angeles, CA 90067
Telephone: (310) 441-0500
4 | Facsimile: (310) 441-4447

5 | Attorney for Plaintiffs
Sun Bright Assets N.V.
6 | & Sun Bright (USA) Inc.

7

## UNITED STATES DISTRICT COURT

8

## CENTRAL DISTRICT OF CALIFORNIA

9

10 | SUN BRIGHT ASSETS N.V., a
Netherlands limited liability company;
11 | and SUN BRIGHT (USA) Inc., a
Delaware corporation,
12

Plaintiffs,

13

v.

14

15 | GEOFFREY K. AUYEUNG, an
individual; SEA FOREST
16 | INTERNATIONAL, LLC; a Washington
limited liability company; NAVIGATOR
17 | ENERGY LOGISTICS, LLC, a
Washington limited liability company;
18 | TERMINAL LOGISTICS
INTERNATIONAL ESCROW
19 | SERVICE, LLC, a Washington limited
liability company; APEX OIL AND GAS
20 | TRADING, LLC, a Washington limited
liability company; ANTONIO
21 | TREVINO MARTINEZ, an individual;
A&A ENERGY, OIL AND GAS, LLC, a
22 | Florida limited liability company;
PEDRO VICENTE SAN JUAN, an
23 | individual; EDUARDO MARTIN
ALMADA, an individual; and DOES 1-
24 | 10, inclusive,

Defendants.

Case No. 2:24-cv-10249

**COMPLAINT FOR:**

**(1) BREACH OF CONTRACT; (2) BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING; (3) BREACH OF NON-DISCLOSURE AGREEMENT; (4) BREACH OF PARTNERSHIP AGREEMENT; (5) BREACH OF FIDUCIARY DUTIES; (6) FRAUD; (7) FRAUDULENT CONCEALMENT; (8) FALSE PROMISE; (9) INTENTIONAL MISREPRESENTATION; (10) FRAUDULENT INDUCEMENT; (11) NEGLIGENT MISREPRESENTATION; (12) INTENTIONAL INTERFERENCE WITH CONTRACTUAL RELATIONS; (13) INDUCING BREACH OF CONTRACT; (14) CONSTRUCTIVE FRAUD; (15) CONVERSION; (16) VIOLATION OF CAL. BUS. & PROF. CODE SECTION 17200 ET SEQ.; (17) SECURITIES FRAUD; (18) CONSPIRACY; (19) AIDING & ABETTING**

**<u>DEMAND FOR JURY TRIAL</u>**

25

26

27

28

---

COMPLAINT

Plaintiffs Sun Bright Assets N.V. & Sun Bright (USA) Inc., by and through its undersigned counsel, sets forth its Complaint against Defendants Geoffrey K. Auyeung; Sea Forest International, LLC; Navigator Energy Logistics, LLC; Terminal Logistics International Escrow Service, LLC; Apex Oil and Gas Trading, LLC; Antonio Trevino Martinez; A&A Energy, Oil and Gas, LLC; Pedro Vicente San Juan; Eduardo Martin Almada; & Does 1-10, and hereby alleges the following:

## INTRODUCTION

This action is rooted in Defendants breach of its obligations and material misrepresentations to Plaintiffs. Plaintiffs endeavored to purchase oil commodities, specifically large quantities of EN590-10PPM & Jet Fuel A1. Defendants worked in concert to defraud Plaintiffs of $1,044,132 and created an intricate façade to abscond with these funds while utterly failing to provide Plaintiffs any of the commodities in return. Defendants purposefully and knowingly choreographed this scheme relying on Pedro Vicente San Juan leveraging his established personal relationship with Guillermo Cristian Amaya and knowledge of Sun Bright Assets N.V.'s and Sun Bright (USA) Inc.'s future plans. Pedro Vicente San Juan brought the other Defendants into the fold and these Defendants worked in concert to perpetuate a false narrative, that "Arenda Servis," "LLP Kurmangazy Petroleum," and "RosEstPetronal Tank Farm," were all real and reputable organizations. These organizations were brought to Plaintiffs' attention to expedite a business proposal that Pedro Vicente San Juan and Martin Almada had brought forth, which unfortunately turned out to be a sham of lucrative oil transactions.

## PARTIES

1.     Plaintiff Sun Bright Assets N.V. ("Sun Bright"), a Netherlands and Curaçao organization, with its principal place of business in Beverly Hills, California, entered into the Irrevocable Purchase Orders ("ICPO(s)") in paragraphs 47 & 50, the Commercial Invoices ("CI(s)") in paragraphs 49 & 52, and Tank Storage

1    Agreements ("TSA(s)") in paragraphs 46 & 51, that are the foundation of the parties'
2    dispute.

3        2.    Plaintiff Sun Bright (USA) Inc. ("Sun Bright USA"), a Delaware
4    corporation, with its principal place of business in Beverly Hills, California, was
5    known to Defendants to be funding many of the transactions herein on behalf of Sun
6    Bright and was therefore likewise defrauded.

7        3.    On information and belief, Defendant Geoffrey K. Auyeung ("Mr.
8    Auyeung") is a citizen of the State of Washington and the sole officer, director, and
9    member of Sea Forest International, LLC ("Sea Forest"), Navigator Energy
10   Logistics, LLC ("Navigator Energy")[1], Terminal Logistics International Escrow
11   Service, LLC ("Terminal"), & Apex Oil and Gas Trading, LLC ("Apex"). These
12   organizations were created by Mr. Auyeung solely to defraud individuals and
13   commit money laundering in relation to oil commodities.

14       4.    On information and belief, Defendants Sea Forest, Navigator Energy,
15   Terminal, & Apex, are all limited liability companies of the State of Washington and
16   headquartered at 6947 Coal Creek Pkwy SE, Suite 101, Newcastle, Washington
17   98059.

18       5.    On information and belief, Defendant Antonio Trevino Martinez, ("Mr.
19   Martinez"), is a citizen of Mexico, and the sole office, director, and member of A&A
20   Energy, Oil and Gas, LLC ("A&A").

21       6.    On information and belief, Defendant A&A, is a Florida limited
22   liability company headquartered at 9000 Sheridan Street, Suite 138, Pembroke
23   Pines, Florida 33024. A&A and Mr. Martinez, falsely represented that they are
24   within the oil industry, and were actively encouraging and participating within the
25   misrepresentations made to Plaintiffs.

26

27

28   [1] To resolve any potential confusion that may arise herein, Navigator Energy shares the same bank account with 'Navigatorenergy Logistics, LLC' & 'Navigator Logistics, LLC' which are believed to either be d/b/a's or unreal entities.

COMPLAINT

7.      On information and belief, Defendant Pedro Vicente San Juan ("Mr. Juan"), is a citizen of Spain, and was the initial person to deceive Plaintiffs and rope them into subsequent oil transactions on false pretenses.

8.      On information and belief, Defendant Eduardo Martin Almada ("Mr. Almada"), is a citizen of Argentina, and worked in concert with the other Defendants to perpetuate a fraud on Plaintiffs.

9.      The true names and capacities of all Defendants sued herein as Does 1 through 10 (the "Doe Defendants") are unknown to Plaintiff, who therefore sues such Defendants by fictitious names.  If necessary, Plaintiff will seek leave of Court to amend this Complaint to state their true names and capacities when the same have been ascertained.  Plaintiff is informed and believes, and on that basis alleges, that the Doe Defendants direct, control, ratify, participate in, materially contribute to, profit from, induce, encourage, facilitate, and/or are the moving force behind the violations of the causes of action raised herein or are otherwise liable to Plaintiff as a result of their participation in all or some of the acts set forth hereinafter.  Plaintiff is further informed and believes and therefore alleges that each of the Doe Defendants was the agent of at least one of the named defendants, and in doing the things alleged in this Complaint was acting within the course and scope of such agency, and/or acted in concert with at least one of the named Defendants, and is jointly and severally liable to Plaintiff with said named Defendants.

## JURISDICTION

10.     The instant court can exercise specific personal jurisdiction over Defendants. There are sufficient "minimum contacts" with the forum state of California under The Due Process Clause "such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." (*LNS Enters, LLC v. Cont'l Motors, Inc.*, 22 F.4th 852, 858 (9th Cir. 2022)). Also, Defendants had knowledge that their actions were tied to Plaintiffs in California. Furthermore, Defendants "purposefully avail[ed] [themselves] of the privileges of conducting

COMPLAINT

1    activities" aimed at the forum. (*Axiom Foods, Inc. v. Acerchem Int'l, Inc.*, 874 F.3d

2    1064, 1068 (9th Cir. 2017) (alterations and quotations omitted)). Factual allegations

3    supporting personal jurisdiction can be seen within paragraphs 20 through 183 of

4    this Complaint.

5        11.    California's long-arm statute allows its courts to exercise jurisdiction

6    on "any basis not inconsistent with the Constitution of this State or of the United

7    States." (Cal.  Civ. Proc. Code § 410.10). As such, the jurisdictional analysis in this

8    case is the same under state and federal law. (*See Yahoo! Inc. v. La Ligue Contre Le*

9    *Racisme Et L'Antisemitisme*, 433 F.3d 1199, 1205 (9th Cir. 2006)(en banc)(per

10    curiam)).

11        12.    This court has subject matter jurisdiction, pursuant to two bases, 28

12    U.S. Code §§ 1332(a) & (c), which create diversity of citizenship, with the amount-

13    in-controversy for all claims exceeding $75,000.

14        13.    Plaintiff Sun Bright Assets N.V. is a registered 'naamloze

15    vennootschap,' a type of public company referred to as a 'limited liability company'

16    within the Netherlands. Sun Bright Assets N.V.'s sole shareholder and member is

17    Sun Bright (USA) Inc., a Delaware corporation registered to do business in

18    California on July 1, 2024, with its principal place of business in Los Angeles,

19    California.    There is federal case law treating such entities, naamloze

20    vennootschaps, as either a corporation or an LLC. If treated as a corporation,

21    authority for subject matter jurisdiction exists under 28 U.S. Code § 1332(c). If

22    treated as an LLC, such jurisdiction exists similarly under 28 U.S. Code § 1332(a)

23    and its various subjections.

24        14.    28 U.S. Code § 1332(c)(1) allows a corporation to be a citizen of (1) the

25    state where its principal place of business is located, and (2) that state in which it

26    is incorporated. (*See Nike, Inc. v. Comercial Iberica de Exclusivas Deportivas, S.A.*,

27    20 F.3d 987, 990 − 991 (9th Cir. 1994)(" We draw no distinction between corporations

28    incorporated in a state of the United States and those incorporated in a foreign

1  country…[Citations omitted]. In each instance, the corporation is deemed a citizen

2  of its place of incorporation and the location of its principal place of business.")).

3      15.   Sun Bright Assets N.V., although incorporated in Curaçao and the

4  Netherlands, maintains it principal place of business in Los Angeles, California.

5  (*See Stockton v. CNH Indus. Am., LLC*, Case No. 16-CV-464-GKF-PJC, at *1 (N.D.

6  Okla. Sep. 29, 2016)(holding that "the fact that a foreign entity uses the words

7  "limited liability" does not itself indicate that it is an LLC for the purposes of U.S.

8  law and the diversity statute. CNH Industrial N.V. was incorporated under the laws

9  of the Netherlands as a naamlooze vennootschap, and other federal courts have

10  treated Netherlands N.V.'s as corporations for the purposes of diversity jurisdiction

11  analysis."); (*citing De Wit v. KLM Royal Dutch Airlines, N.V.*, 570 F.Supp. 613, 616

12  (S.D.N.Y. 1983)).

13      16.   If Sun Bright Assets N.V. is treated as an LLC and its citizenship is

14  determined by its members, its sole member Sun Bright (USA) Inc. nevertheless is

15  incorporated in Delaware with its principal place of business in Los Angeles,

16  California. (*See below for authority*).

17      17.   28 U.S. Code § 1332(a)(2) covers "citizens or subjects of a foreign state"

18  and "applies to foreign legal entities of all kinds, so long as the entity is considered

19  a juridical person under the law that created it," (*Petropolous v. FCA US, LLC*, Case

20  No. 17-CV-0398-W-(KSC), at *5 (S.D. Cal. July 7, 2017) (Analyzing Fiat

21  Chrysler Automobiles N.V.'s citizenship as the sole member of FCA US LLC,

22  under 28 U.S. Code §  1332(a)(2)); (*See Also Johnson v. Columbia Properties

23  Anchorage*, 437 F.3d 894, 899 (9th Cir. 2006)("We therefore join our sister circuits

24  and hold that, like a partnership, an LLC is a citizen of every state of which its

25  owners/members are citizens.")). Since the sole member of Sun Bright Assets N.V. is

26  Sun Bright (USA) Inc., a Delaware entity with a principal place of business in Los

27  Angeles, California, diversity jurisdiction is met herein.

28

18.    Given the above, this Court may also exercise subject matter jurisdiction pursuant to 28 U.S. Code § 1332(a)(1) which applies to "citizens of different States."

19.    Venue is also proper in the U.S. District Court, Central District of California pursuant to 28 U.S.C. §§ 1391(b)(2) & (3) because "a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated" in the judicial district for the Central District of California and Defendants are "subject to the court's personal jurisdiction with respect to such action."

## GENERAL ALLEGATIONS

20.    During all 'General Allegations' mentioned within this Complaint, unless otherwise stated, Plaintiffs' principal place of business, monetary capital utilized for funding, and communications telephonically, by electronic-mail, by facsimile, and by video, were all administered through Plaintiffs' Beverly Hills, California, office location.

21.    All Defendants herein were informed that Plaintiffs' principal place of business was California, that the capital utilized for funding the transactions were from California, that Guillermo Cristian Amaya Cruz ("Mr. Cruz"), a Honduran citizen and CEO of Sun Bright & Sun Bright USA, is domiciled within Los Angeles, California, that Plaintiffs' counsel herein were based in California, and that Sun Bright USA was not only going to be registered to conduct business in California to facilitate future transactions, but ultimately was jointly funding Plaintiffs' transactions herein.

22.    Plaintiffs Sun Bright and Sun Bright USA, in early-2023, began investigating individuals and further opportunities connected with the oil business as a means of investment.

23.    Plaintiffs, in preparation to facilitate future oil businesses, pooled the capital that they would utilize into a singular banking account.

24.     Plaintiffs were focused on expanding into Jet Fuel A1 ("A1"), and EN590-10PPM ("EN590"), and had conducted extensive research into why those products would yield favorable future returns and would be a viable business to market within and conduct sales.

25.     Mr. Cruz by this point, maintained a longstanding eighteen-year friendship and occasional business relations with Mr. Juan.

26.     Mr. Juan advertised to Plaintiffs that he associated with a collection of highly regarded oil refineries based in Russia and Kazakhstan that wished to break further into the U.S. market and connect with investors in California.

27.     Upon Mr. Juan's recommendation, Plaintiffs entered into communications with Mr. Almada, around March 2023, who similarly represented his ties and five-year friendship with a collective of Russian and Kazakhstan oil refineries.

28.     Mr. Juan and Mr. Almada informed Plaintiffs that the Russian and Kazakhstan oil refineries endeavored to facilitate oil transactions and branding as dependable suppliers to U.S. businesses.

29.     Both Mr. Juan and Mr. Almada represented that they had considerable experience within the oil industry to Plaintiffs and well-established connections that could prove lucrative.

30.     Mr. Juan and Mr. Almada framed their connections to the oil industry as a future business proposal and 'alliance' that Plaintiffs should consider to pursue as partners.

31.     Plaintiffs' staff, as a routine business practice before beginning any new commercial opportunity, assess any 'red-flags' and spend time conducting a customary due diligence review.

32.     Plaintiffs' staff performed said due diligence review into Mr. Juan and Mr. Almada, throughout March and April 2023, which came back with nothing

COMPLAINT

alarming, before proceeding into further business discussions with these individuals.

33.   Mr. Juan was offered and entered into a Strategic Commercial Alliance Agreement on September 30, 2023, to serve as the Sales Director of Sun Bright. Attached is a true and correct copy of said Commercial Alliance Agreement, referred to as "Exhibit 17."

34.   Mr. Almada was offered and entered into a Strategic Commercial Alliance Agreement on September 30, 2023, to serve as Director of Operations of Sun Bright. Attached is a true and correct copy of said Commercial Alliance Agreement, referred to as "Exhibit 18."

35.   The partnership between Plaintiffs, Mr. Juan, and Mr. Almada was formed.

36.   After executing Strategic Commercial Alliance Agreements, which contain Non-Disclosure Agreements premised on confidentiality clauses, Mr. Juan and Mr. Almada were provided Plaintiffs' marketing and expansion projects, investment strategies, budgets, costs, financial data, and other logistical information about Plaintiffs.

37.   Mr. Juan and Mr. Almada later made representations Plaintiffs that Arenda Servis ("Arenda"), an apparent Russian entity, and Matveev Sergej Vladimirovich ("Mr. Vladimirovich"), an alleged Russian citizen and Arenda's Director, were reputable, trustworthy, had been utilized by the duo previously, and should be utilized by Plaintiffs to facilitate oil related transactions in the future as an intermediary.

38.   Mr. Juan and Mr. Almada communicated to Plaintiffs that Arenda served as an intermediary to a collective of 26 certified oil refineries throughout Russia and Kazakhstan and would routinely orchestrate oil transactions between buyers and said oil refineries. Arenda was the group of well-established and friendly refineries that Mr. Juan and Mr. Almada had previously discussed having ties to.

39.     Mr. Juan and Mr. Almada made representations to Plaintiffs that RosEstPetronal Tank Storage ("RosEst"), an apparent Russian entity, and Anna Afasyovena ("Ms. Afasyovena"), an alleged Russian citizen and RosEst's Operations and Assistance Manager, were reputable, trustworthy, had been utilized by the duo previously, and should be utilized by Plaintiff to facilitate oil related transactions in the future.

40.     Mr. Juan and Mr. Almada made representations to Plaintiffs that RosEst had previously served as the intermediary escrow holder for transactions the duo had conducted and was a consistently reliable storage tank farm between seller refineries and buyers such as Plaintiffs.

41.     Arenda recommended LLP Kurmangazy Petroleum ("Kurmangazy"), an apparent Russian entity which delivers oil related products with an origin from Kazakhstan, and Kurmangazy's director, Zholdasov Edge Baktigalievich ("Mr. Baktigalievich"), an alleged Russian citizen, be utilized as the refinery in any future oil transactions that Plaintiffs participate within.

42.     Instead of relying solely on Mr. Juan's and Mr. Almada's initial verbal representations, Plaintiffs instructed Mr. Juan and Mr. Almada to conduct due diligence into Arenda, RosEst, and Kurmangazy and assure Plaintiffs that the organizations were above-board before entering into negotiations.

43.     Mr. Juan and Mr. Almada not only continued to assure Plaintiffs of the legitimacy of Arenda, RosEst, and Kurmangazy, but provided other materials, including screenshots of apparent transactions into RosEst's accounts from Mr. Juan's and Mr. Almada's other client(s) – for instance, A&A Energy Oil and Gas, LLC ("A&A"). Attached is a true and correct copy of one of said screenshots, referred to as "Exhibit 22."

44.     After extensive negotiations with Arenda, RosEst, and Kurmangazy, with Mr. Juan and Mr. Almada facilitating such, Plaintiffs concluded that they

COMPLAINT

wished to purchase 2,000,000 barrels ("BBL's") of A1, and 50,000 metric tons ("MT's") of EN590, automotive diesel fuel, and began making steps to realize such.

45.    Before heading into formalizing agreements with Arenda, RosEst, and Kurmangazy, Plaintiffs came into an informal division of work internally. Wherein, Mr. Cruz would be preoccupied with acquiring clients and buyers of EN590 and A1, while Mr. Juan and Mr. Almada would be in-charge of conducting the oil transactions with Arenda, RosEst, and Kurmangazy given their positions within Sun Bright and previous connections with the entities and individuals therein.

46.    On April 4, 2024, a "Tank Storage Agreement," was executed by and between RosEst (as 'Lessor') and Sun Bright (as 'Lessee') for the storage of 50,000 MT of EN590 with $52,000.00 to be charged per day for storage at the Rotterdam port within the Netherlands. Attached is a true and correct copy of said TSA, referred to as "Exhibit 1."

47.    On April 24, 2024, an "Irrevocable Purchase Order" ("ICPO"), from Sun Bright to Arenda was issued, which was subsequently provided by Arenda to Kurmangazy, for 600,000 MT of EN590 (50,000 MT of which was to occur on a trial basis) over twelve months. Attached is a true and correct copy of said ICPO, referred to as "Exhibit 2."

48.    On April 29, 2024, a "Warning Letter for Buyer and Seller," was issued by The International Chamber of Commerce, by and between Kurmangazy (as 'Seller Company') and Sun Bright (as 'Buyer Company'), but only executed by Kurmangazy, related to "CONTRACT - KPKAZA/EN590/6987635/SBANV"; "ICCP-NUMBER: EN590-10PPM-937653-7645."

49.    On April 29, 2024, a fully executed "Commercial Invoice-EN590-10PPM," (Ref. No. "KPKAZA/EN590/6987635/SBANV"), by and between Kurmangazy and Sun Bright exists for $15,000,000.00 worth or 50,000 MT with payments to go to a 'First Heartland Jusan Bank.' Attached is a true and correct copy of said CI, referred to as "Exhibit 3."

50.     On April 29, 2024, an ICPO from Sun Bright to Arenda was issued, which was subsequently provided by Arenda to Kurmangazy, for 24,000,000 BBL's of A1 (2,000,000 BBL's of which was to occur on a trial basis) over twelve months. Attached is a true and correct copy of said ICPO, referred to as "Exhibit 4."

51.     On April 29, 2024, a "Tank Storage Agreement," was executed by and between RosEst (as 'Lessor') and Sun Bright (as 'Lessee') for the storage of 2,000,000 BBL's of A1 with $52,000.00 to be charged per day for storage at the Rotterdam port within the Netherlands. Attached is a true and correct copy of said TSA, referred to as "Exhibit 5."

52.     On April 30, 2024, a "Commercial Invoice-JetFuelA1," (Ref. No. "KPKAZA/JETFUELA1/9374874654/SBANV"), by and between Kurmangazy and Sun Bright exists for 2,000,000 BBL's of A1 with payments to go to a 'First Heartland Jusan Bank.' Attached is a true and correct copy of said CI, referred to as "Exhibit 6."

53.     The ICPO's and Commercial Invoices mentioned herein have similar requirements with the Commercial Invoice for A1 requiring: '(i) Buyer issues ICPO after viewing the Seller' SCO Procedure; (ii) Seller issue to Buyer Commercial Invoice + TSA, Buyer sign & returns the CI to Seller; (iii) Seller rent the Buyer's Tank for 3 days for Injection, Buyer also pays both nominated Tank Storage Facility for 2 days after Buyer's tank Farm Company has received payment from the Seller Company; (iv) Seller provides Buyer the below POP [Product Passports / Proof-of-Product] Documents: a-Injection Report, b- Tank Storage Receipt, c- Tank Farm Bar-code information, d- Letter of Commitment to supply, e- Registration Certificate, f- Fresh SGS [Société Générale de Surveillance] Report 48 Hours, g-Unconditional DTA; (v) Buyer conduct Dip-Test, via SGS and after Dip-Test Buyer makes payment as per MT103 wire transfer/TT according to the Commercial Invoice, Buyer Lift the product; (vi) Seller transfer the title of ownership as per Buyer's instruction. Buyer lifts the Product; (vii) Seller pays all intermediaries of

the Seller Side. Buyer pays all intermediaries of the Buyer Side involved in the transaction; (viii) Subsequently monthly shipment continues as per terms and conditions of the sales ad purchase agreement contract between Buyer and Seller to be issued and accepted; (ix) Seller and Buyer will respect NCNDA-IMFPA."

54.    The Commercial Invoice for EN590 and A1 required Plaintiffs to pay for two days of tank storage.

55.    Around the time the Commercial Invoices ("CI's") were being executed, it was mentioned and understood by Arenda, Kurmangazy, and RosEst that it would take approximately five days to inject 50,000 MT of EN590 and eight days to inject 2,000,000 BBL's of A1 into RostEst's tank farm.

56.    It was further understood by all parties involved in the EN590 and A1 transactions that the traditions and customs of oil commodity deals would be adhered to, traditions which include:

57.    (i) Nominating the tank farm to serve as an escrow intermediary in payments for the refinery as well, in this case, RosEst;

58.    (ii) EPC's are payments to port authorities that must be made to access commodities stored there, similar to a tax. EPC's are momentarily paid by the refinery but then become the obligation of a buyer to access oil once it is injected;

59.    (iii) SGS documents are issued by the Société Générale de Surveillance, an independent organization which sends an adjuster to measure and certify the quantity, quality, and type of fuel injected into a tank farm. SGS documents also serve as the 'pink slip' in commodity transactions and are utilized to transfer title from a refinery to a buyer;

60.    (iv) EPC and SGS payments to a tank farm on behalf of a refinery from a buyer, would constitute the payments that said buyer needs to make contractually to a refinery;

61.    and (v) the "SPA" or "Sales and Purchase Agreements" mentioned in the CI's would only be drafted and exist after a trial transaction for the EN590 and A1 was successfully completed.

62.    It was further agreed to by Plaintiffs and the parties herein that:

63.    (i) Any payments for renting the tank farm beyond two days for injecting the EN590 were to be paid by Kurmangazy in accordance with the CI;

64.    (ii) Any payments for renting the tank farm beyond two days for injecting the A1 were to be paid by Kurmangazy in accordance with the CI;

65.    and (iii) the Injection Schedules which call for five total days to inject EN590 and seven total days to inject A1, would be adhered to. The injection of the EN590 was originally to occur between May 14 – 18, 2024, but was rescheduled to May 17 – 22, 2024. The injection of the A1 was scheduled to occur from May 17 – 24, 2024. Attached is a true and correct copy of said Injection Schedules, referred to as "Exhibit(s) 7, 8, & 9."

66.    It is important to note that Defendants knew RosEst, Kurmangazy, and Plaintiffs all agreed that RosEst would serve as an intermediary in receiving payments. Therefore, any payments RosEst received through the entities it requested wires to (many of the Defendants herein), were all known by the Defendants to be a vehicle for perpetuating a fraud on Plaintiffs.

67.    On May 1, 2024, a Payment Slip was created showing that $104,000.00 was sent to Sea Forest International, LLC (account: 82000672248) on behalf of Plaintiffs for their two days of storage of EN590. Per the CI, Plaintiffs have met their payment obligations herein for tank storage and now solely needed to make EPC + SGS payments after the injection occurs for the EN590. Attached is a true and correct copy of said Payment Slip, referred to as "Exhibit 10."

68.    On May 2, 2024, Plaintiffs informed Kurmangazy that the payment related to EN590 was made and Kurmangazy's response was: "We acknowledged your message with your thanks, we shall be waiting for the (TSR) from Buyer's Tank

COMPLAINT

Farm to enable us to release the POP documents amd SGS Report." Attached is a true and correct copy of said communication, referred to as "Exhibit 23."

69. The tank storage receipt ("TSR") essentially would serve as proof from RosEst that payments have been made in relation to the CI's and TSA's for a product to receive tank storage once injected.

70. On May 7, 2024, an Invoice for $104,000.00 was requested by RosEst with the cash to be wired to Navigator Logistics, LLC (account: 138132113847) for two days of storage of EN590 with Sun Bright represented by Mr. Almada. This was disregarded as this was already paid by Plaintiffs and noted as an administrative error on RosEst's part. Attached is a true and correct copy of said Invoice, referred to as "Exhibit 37."

71. On May 8, 2024, an Invoice for $104,000.00 was requested by RosEst with the cash to be wired to Navigator Logistics, LLC (account: 138132113847) for two days of storage of Jet Fuel A1 to be paid by Plaintiffs while represented by Mr. Almada. Attached is a true and correct copy of said Invoice, referred to as "Exhibit 38."

72. On May 8, 2024, a TSR for EN590 was issued by RosEst for five days of rent for the EN590 at a total of $260,000.00. This meant that RosEst was stating that Kurmangazy had paid for three of the five days, Plaintiffs for two, and Plaintiffs had met its obligations. Attached is a true and correct copy of said TSR, referred to as "Exhibit 39."

73. On May 8, 2024, a Payment Slip was created showing that $104,000.00 was sent to Navigator Logistics, LLC (account: 138132113847) on behalf of Plaintiffs for their two days of storage of A1. Per the CI, Plaintiffs have met their payment obligations herein for tank storage and now solely needed to make EPC + SGS payments after the injection occurs for the A1. Attached is a true and correct copy of said Payment Slip, referred to as "Exhibit 11."

74. On May 8, an Invoice for $52,000 was requested by RosEst with cash to be wired to Navigator Logistics, LLC (account: 138132113847) for two days of storage of Jet Fuel A1 to be paid by Plaintiffs. This invoice was originally disregarded by Plaintiffs as an administrative error on the part of RosEst as well. Attached is a true and correct copy of said Invoice, referred to as "Exhibit 12."

75. On May 9, 2024, a TSR for JET-A1 was issued by RosEst for five days of rent for the A1 at a total of $260,000.00. This meant that RosEst was stating that Kurmangazy had paid for three of the five days, Plaintiffs for two, and Plaintiffs had met its obligations. Attached is a true and correct copy of said TSR, referred to as "Exhibit 40."

76. On May 10, 2024, Kurmangazy thanks Plaintiffs for its satisfaction of all requests thus far and states: "This is to also inform the parties that POP documents are ready, and we scheduled to commence with the Injection Process by next week. We kindly urged the Buyer's nominated tank storage facility LLC ROSESTPETRONAL COMPANY to kindly endorse the both Injection Scheduled for JET FUEL A1 - 2,000,000 Barrels and EN590-10PPM - 50,000MT as to confirm their readiness to receive the 2 products in their storage tanks and also to enable us to release POP documents for the Injection Process aspa programmed." Attached is a true and correct copy of said communication, referred to as "Exhibit 24."

77. On May 11, 2024, an Invoice for $156,000.00 occurred from RosEst to Plaintiffs, asking for money to be wired to Navigatorenergy Logistics, LLC (account: 138132113847) so that three days of rent of the A1 could occur. Attached is a true and correct copy of said Invoice, referred to as "Exhibit 41."

78. It should be noted that at this point in time Plaintiffs had many clients and buyers that they had lined-up and made agreements with to acquire the En590 and A1.

79. Furthermore, Mr. Juan and Mr. Almada, and through them Arenda, Kurmangazy, RosEst, and the Defendants, knew that Plaintiffs felt compelled to

make the deals with their 'lined-up' clients and buyers work. Therefore, Defendants had leverage herein to force Plaintiffs to agree to make more payments than contemplated under the ICPO's, CI's, and TSA's.

80.     Additionally, while Mr. Cruz was facilitating discussions and negotiations with these 'lined-up' clients and buyers, Mr. Juan and Mr. Almada were the individuals who, in accordance with a previous internal division of work, were heading the acquisition of EN590 and A1.

81.     As such, under the guise of facilitating the agreements with Arenda, RostEst, and Kurmangazy, Mr. Juan and Mr. Almada informed Plaintiffs that logistics and complications required Plaintiffs to make further payments for A1 than were required under the CI.

82.     Mr. Juan and Mr. Almada informed Mr. Cruz that seven days of tank storage, the full injection schedule for A1, would have to be covered by Plaintiffs if they wished for that transaction to proceed on-schedule and promptly given Kurmangazy experiencing unexpected banking complications with its previous wire(s) to RosEst.

83.     Mr. Juan and Mr. Almada knew that Plaintiffs had staked their reputation on the line with certain clients and potential buyers and therefore needed to make the underlying oil transactions occur despite more payments.

84.     The other Defendants, through Mr. Juan and Mr. Almada, knew that Plaintiffs had staked their reputation on the line with certain clients and potential buyers and therefore needed to make the underlying oil transactions occur despite more payments.

85.     On May 13, 2024, a Payment Slip was created showing that $156,000.00 was sent to Navigator Logistics, LLC (account: 138132113847) on behalf of Plaintiffs for three additional days of storage of A1. Attached is a true and correct copy of said Payment Slip, referred to as "Exhibit 13."

86.    On May 13, 2024, a Payment Slip was created showing that $52,000.00 was sent to Navigator Logistics, LLC (account: 138132113847) on behalf of Plaintiffs for two additional days of storage of A1 at a discounted rate. Attached is a true and correct copy of said Payment Slip, referred to as "Exhibit 14."

87.    At this time, Plaintiffs have paid for two days of storage of EN590 in compliance with the ICPO's, CI's, and TSA's. Moreover, Plaintiffs went beyond said agreements and have paid for seven days of storage of A1.

88.    On May 15, 2024, RosEst confirmed receipt of the requested payments and Kurmangazy sent forth its Injection Schedule. Attached is a true and correct copy of said communication, referred to as "Exhibit 25."

89.    Around May 16, 2024, Plaintiffs are informed by RosEst that RosEst's bank will no longer accept payments into Navigatorenergy Logistics, LLC, Navigator Logistics, LLC, nor Sea Forest International, LLC, and that this is due to the sheer amount of economic activity that Plaintiffs have participated in.

90.    Around May 16, 2024, RosEst requests that Plaintiffs make future payments (for the EPC + SGS) into Apex Oil and Gas Trading, LLC's ("Apex") account.

91.    Around May 16, 2024, Mr. Almada and Mr. Juan introduce Plaintiffs to Mr. Martinez, the CEO of A&A. Mr. Almada and Mr. Juan reiterate that they have conducted positive business transactions with Mr. Martinez and A&A.

92.    Around May 16, 2024, Mr. Martinez informs Plaintiffs that he has done business with RostEst extensively, that RosEst is to be trusted, and provided a screenshot of a payment he made to Apex's account on May 17, 2024, after stating that he had conducted payments before in multiple instances. Attached is a true and correct copy of said screenshot, referred to as "Exhibit 21." Mr. Martinez went onto state to Mr. Cruz in a phone call that A&A conducts monthly operations with RosEst.

93.    On May 16 – 21, 2024, Kurmangazy stated that it had successfully injected some EN590 and A1 into RosEst's tank farm in Rotterdam on each of those days. (*See* Exhibit 25).

94.    On May 18, 2024, an Invoice for $329,781.00 occurred from RosEst to Plaintiffs, asking for money to be wired to Apex Oil so that EPC + SGS Analysis of the A1 could occur. Attached is a true and correct copy of said Invoice, referred to as "Exhibit 42."

95.    On May 18, 2024, an Invoice for $298,351.00 occurred from RosEst to Plaintiffs, asking for money to be wired to Apex Oil so that EPC + SGS Analysis of the EN590 could occur with $156,120 going towards EPC and $142,231 towards SGS. Attached is a true and correct copy of said Invoice, referred to as "Exhibit 43."

96.    On May 20, 2024, a Payment Slip was created showing that $298,351.00 was sent to Apex Oil and Gas Trading, LLC (account: 138131692026) on behalf of Plaintiffs for EPC + SGS of EN590. Per the CI, Plaintiffs have completely met their payment obligations herein. Attached is a true and correct copy of said Payment Slip, referred to as "Exhibit 15."

97.    On May 23, 2024, a Confirmation Letter was sent from RosEst to Plaintiffs, which discussed how 50,000 MT of EN590 were acquired "perfect[ly]" and they look forward to acquiring the A1. Attached is a true and correct copy of said Confirmation Letter, referred to as "Exhibit 26."

98.    On May 23, 2024, a Payment Slip was created showing that $329,781.00 was sent to Apex Oil and Gas Trading, LLC (account: 138131692026) on behalf of Plaintiffs for EPC + SGS of A1. Per the CI, Plaintiffs have completely met their payment obligations herein and went beyond such to cover all the other days of rent therein.  Attached is a true and correct copy of said Payment Slip, referred to as "Exhibit 16."

99.    At this point, Plaintiffs have made $1,044,132 in payments.

100.    Kurmangazy, to be compliant with the ICPO's, CI's, and TSA's, would now have to provide POP, EPC, and SGS documents to Plaintiffs after completing injections.

101.    Around May 24, 2024, two Injection Schedules were circulated by RosEst and Kurmangazy to Plaintiffs, one in relation to EN590, confirming the alleged injection of 50,000 MT, and one in relation to A1, confirming the alleged injection of 2,000,000 BBL's.  (*See* Exhibits 8 & 9).

102.    At this point, Kurmangazy was required to provide POP, EPC, and SGS documents to Plaintiffs for the EN590 and A1.

103.    Instead, out of nowhere, Plaintiffs are informed by Kurmangazy, RosEst, Mr. Juan, and Mr. Almada that delays had occurred on RosEst receiving Plaintiffs' recent payments.

104.    For instance, around May 27, 2024, RosEst demanded demurrage payments to occur due to the delay. RosEst further unilaterally canceled shipping the EN590 as well until it received payments.

105.    Mr. Juan and Mr. Almada informed Plaintiffs that the delay was caused by the Memorial Day weekend and that unfortunately, the U.S. banks caused a delay on RosEst receiving Plaintiffs' payments.

106.    Mr. Juan and Mr. Almada informed Plaintiffs that the EPC + SGS documents expire within $48 - 72$ hours and thus a delay would lead to further payments having to be made.

107.    Plaintiffs were extremely concerned about the other deals they had lined-up with clients and potential buyers falling through and needed to make the EN590 and A1 transactions successful by whatever means necessary.

108.    On May 30, 2024, a "Tank Storage Receipt #JetA1" was issued by RosEst for eight days of rent for 2,000,000 BBLs of A1 at a total amount of $416,000. Attached is a true and correct copy of said TSR, referred to as "Exhibit 44."

109.    On May 30, 2024, a Request for Payment Invoice Ref. No. RST/TKS/JA1/53 from RosEst (specifically for $208,000.00 to Apex's account) for storage tank demurrage occurred. Attached is a true and correct copy of said Request for Payment Invoice, referred to as "Exhibit 45."

110.    On May 31, 2024, a Payment Slip for $208,000.00 being sent to Apex Oil and Gas Trading, LLC's account from "Sunnatilla Alisherovich" occurred and any issues regarding demurrage had been resolved. Attached is a true and correct copy of said Payment Slip, referred to as "Exhibit 46."

111.    Plaintiffs at this point were still unaware that they were being defrauded and were relying upon Mr. Juan's and Mr. Almada's expertise, connections, and the previous understanding regarding internal division of work, to proceed with successfully completing the transactions.

112.    Plaintiffs at this point have met all payments that they contractually owe as well as the demurrage payments.

113.    Kurmangazy would have to provide POP, EPC, and SGS documents to Plaintiffs.

114.    Instead, Defendants through Arenda, Kurmangazy, and RosEst continue to perpetuate the fraud that Plaintiffs are still unaware of.

115.    Mr. Juan and Mr. Almada reiterated to Plaintiffs that the POP + EPC + SGS documents expire within 48 – 72 hours and thus a delay would lead to further payments having to be made.

116.    On May 31, 2024, an Invoice No. LLPKP003995 was issued to Plaintiffs for EN590 at 50,000 MT and 2,000,000 BBLs of A1 for $450,000. Terminal Logistics International Services, LLC was to receive the capital on behalf of Kurmangazy. Kurmangazy now argued that Plaintiffs' delay meant it needed to pay $450,000 for POP, EPC, and SGS to be reissued, otherwise the transaction would not continue. Attached is a true and correct copy of a communication showing Kurmangazy's demand for $450,000 and argument that POP, EPC, and SGS had expired, referred

1    to as "Exhibit 27." Additionally, attached is a true and correct copy of Invoice No.

2    LLPKP003995, referred to as "Exhibit 47."

3        117.    Plaintiffs had already timely settled their final obligations for the

4    EN590 and A1, such as their EPC + SGS payments on May 20 & 23, 2024.

5        118.    This request for $450,000 by Defendants through Kurmangazy will

6    continue multiple times hereon out. There was nothing in the ICPO's, CI's, or TSA's

7    that discussed such a payment to occur after a delay, but it is routine for buyers to

8    initially pay for these documents.

9        119.    Around May 31, 2024, an email chain occurred wherein Plaintiffs wrote

10    to Arenda, Kurmangazy, & RosEst explaining how Plaintiffs could not through the

11    port authority of Rotterdam certify the operations of RosEst and that Plaintiffs

12    would wait for verification that the products exist before making payments.

13    Kurmangazy's response was to allege that they had injected the products into the

14    tank farm and that Plaintiffs will not be able to check the authenticity of the

15    products in the port without an ATV which will not be given by Kurmangazy until

16    $450,000.00 is paid to them. (*See* Exhibit 27).

17        120.    On May 31, 2024, an email chain occurred wherein RosEstPetronal

18    confirmed to Kurmangazy that "WE RECEIVED YOUR DEMURRAGE PAYMENT

19    INVOICE AND HAS BEEN FORWARDED TO OUR BANK FOR PAYMENT

20    PROCESS!" Then, Plaintiffs to Kurmangazy stated: "Since our tank farm recognized

21    the (EPC) and (SGS) payments, we ask your kind company to provide us with the

22    (POP) documents for both products to authorize the sending of the money payment

23    for both operations." Kurmangazy's response was that the POP / SGS / EPC

24    documents had allegedly expired and sent an invoice for Plaintiffs to pay. Plaintiffs

25    stated that: "To the management of Kurmangaz LLP. We urge your esteem company

26    to kindly release the authorization to verify the products in our storage tank to Sun

27    bright assest NV. Upon the satisfaction of the quantity and quality of the products,

28

the buyer bank will release the remittance without any delay." Attached is a true and correct copy of said communications, referred to as "Exhibit 28."

121.    Around May 31, 2024, Plaintiffs asked Kurmangazy for proof that the POP / SGS / EPC documents had expired and to see the documents, Plaintiffs were not provided such.

122.    Kurmangazy's response on May 31, 2024, and through communications around June 1, 2024 with Mr. Juan and/or Mr. Almada, was to reiterate that more capital, $450,000, would have to be paid by Plaintiffs now given the POP / SGS / EPC documents had allegedly expired and the payment had to occur by next Monday (July 3, 2024). Kurmangazy went onto threaten Plaintiffs: "We kindly warned the Buyer's side to further act with professionalism and also to desist…because if that continues or repeats again your esteem company will not like our response." (*See* Exhibit 27).

123.    Plaintiffs had already invested hundreds of thousands of dollars at this point and were being assured by their partners, Mr. Juan and Mr. Almada, that Kurmangazy's representations were true. Plaintiffs felt compelled to somehow make these transactions work.

124.    Mr. Juan and Mr. Almada nonetheless assured Plaintiffs that due to their connections with Arenda, Kurmangazy, and RosEst, they could get an extension on the $450,000 payment occurring.

125.    On June 4, 2024, Kurmangazy demands that Plaintiffs provide $450,000.00 so that the SGS Report and POP / EPC documents can be renewed, "as we all agreed to enable us to renew all the invalid documents and to proceed immediately to close the transaction without further hesitating. We thank you all for your great efforts and maximum cooperation." Attached is a true and correct copy of said communications, referred to as "Exhibit 29."

126.    Around June 10, 2024, Plaintiffs reiterated to Kurmangazy that it wished to see the expired POP / SGS / EPC documents.

COMPLAINT

127.    On June 10, 2024, an Invoice No. LLPKP003998 for $450,000.00 for 50,000 MT of EN590 and 2,000,000 BBLs of Jet Fuel A1 was executed by LLP Kurmangazy Petroleum for SGS Reports and Product Passports (POP) to Terminal Logistics International Escrow Service, LLC related to commercial invoices: KPKAZA/EN590/6987635/SBANV & KPKAZA/JETFUELA1/9374874654/SBANV. Attached is a true and correct copy of Invoice No. LLPK003998, referred to as "Exhibit 48."

128.    On June 14, 2024, an Invoice No. LLPKP004879 for $450,000.00 to be wired from Plaintiffs to Terminal Logistics International Escrow Service, LLC for 50,000 MT of EN590 and 2,000,000 BBLs of Jet Fuel A1 was executed by LLP Kurmangazy Petroleum for SGS Reports and Products Passports (POP) – related to commercial invoices:          KPKAZA/EN590/6987635/SBANV          & KPKAZA/JETFUELA1/9374874654/SBANV. Attached is a true and correct copy of Invoice No. LLPK003998, referred to as "Exhibit 49."

129.    Around June 14, 2024, Plaintiffs requested that Kurmangazy provide proof that the POP / SGS / EPC documents were expired.

130.    On June 17, 2024, the April 29, 2024, Warning Letter for Buyer and Seller, is executed by Plaintiffs as well. Attached is a true and correct copy of the Warning Letter for Buyer and Seller, referred to as "Exhibit 50."

131.    On June 21, 2024, an Invoice No. LLPKP004879 for $450,000.00 to be wired from Plaintiffs to Terminal Logistics International Escrow Service, LLC for 50,000 MT of EN590 and 2,000,000 BBLs of Jet Fuel A1 was reissued by LLP Kurmangazy Petroleum for SGS Reports and Products Passports (POP) – related to commercial invoices:          KPKAZA/EN590/6987635/SBANV          & KPKAZA/JETFUELA1/9374874654/SBANV.  Attached is a true and correct copy of Invoice No. LLPK004879, referred to as "Exhibit 51."

132.    Around June 21, 2024, Plaintiffs asked Kurmangazy for proof that the POP / SGS / EPC documents had expired.

133.    Around this point in time, Plaintiffs' lined-up clients and potential buyers are demanding Plaintiffs honor their word and somehow provide EN590 and A1 to them.

134.    Plaintiffs were under immense pressure to make the EN590 and A1 deals transpire successfully.

135.    Around June 22, 2024, Mr. Juan and Mr. Almada, presumptively working with the other Defendants, decide that they should bring Mr. Martinez and A&A into the underlying transactions as a means of legitimizing Kurmangazy's demand for $450,000, and to acquire more time before Plaintiffs realize that they have been defrauded.

136.    Around June 27, 2024, per Mr. Juan's and Mr. Almada's suggestions, Plaintiffs negotiated with Mr. Martinez and A&A for A&A to pay the $450,000 being requested.

137.    On June 28, 2024, Plaintiffs informed Kurmangazy that the $450,000 would be paid by A&A soon and discussed banking restrictions being the hurdle that now had to be overcome. Kurmangazy's response was: "Please kindly advise your Buyer that his constant delayed on this transaction will no longer be acceptable from next week, note that we cannot allow the Buyer to keep on delaying his payment process…" Attached is a true and correct copy of the email communication, referred to as "Exhibit 30."

138.    On July 8, 2024, Kurmangazy sends an email with a "Pre-Tarmination Letter" to Plaintiffs for endorsement so that Kurmangazy may be enabled "to divert the allocation to other serious standy Buyers." Attached is a true and correct copy of the 'Pre-T[e]rmination letter,' referred to as "Exhibit 31." (*See Also* Exhibit 30).

139.    The Pre-Tarmination Letter provides Plaintiffs until July 10, 2024, to make the $450,000 payment and states that if this does not occur then Kurmangazy will divert the A1 and EN590 to standby buyers. (*See* Exhibit 31).

COMPLAINT

140.    On July 9, 2024, a "Proforma Invoice," for A1 (Ref. No. 0709012024) by and between Sun Bright (as 'Seller') and A&A (as 'Buyer'), was fully executed for $450,000 by Mr. Martinez. Attached is a true and correct copy of said Proforma Invoice, referred to as "Exhibit 19."

141.    On July 10, 2024, Plaintiffs inform Kurmangazy that they are working on acquiring the $450,000 and forward the Proforma Invoice with A&A stating that they will fund the POP / SGS / EPC documents. Kurmangazy responds by stating Plaintiffs have until July 14, 2024, to conduct the payment. Kurmangazy also issues an Invoice No. LLPKP005895 to reflect that A&A is a party to the transaction involving the A1 and EN590 payments for POP / SGS / EPC documents to Terminal Logistics. Attached is a true and correct copy of said Invoice No. LLPKP005895 and the related communications, referred to as "Exhibit(s) 20 & 32."

142.    Around July 10, 2024, Plaintiffs reiterated to Kurmangazy the need to see the expired POP / SGS / EPC documents.

143.    Around July 10, 2024, Mr. Martinez and A&A communicate the Plaintiffs that they are having difficulties with wiring the $450,000 to Kurmangazy and need more time, but will conduct the transaction. Mr. Martinez & A&A also stated that they need POP / SGS / EPC or other documents that can prove the products exist before wiring capital.

144.    It is important to note that at this point, unbeknownst to Plaintiffs, they are continually being defrauded and about to be 'spun in a circle.' Kurmangazy wants $450,000 for allegedly expired POP / SGS / EPC documents. A&A agreed to pay $450,000, but only after receiving proof of product. Kurmangazy will not pay for proof of product without receiving $450,000. This cycle allowed Defendants to continue to accrue time on their fraud without Plaintiffs knowledge and to continue negotiating with all parties to see if the underlying transactions could occur.

145.    On July 15, 2024, an email chain occurred wherein Plaintiffs ask RosEst to confirm whether the A1 still is within their tank farm for Plaintiffs' buyer.

1    RosEst made assurances to Plaintiffs that the product is still available. Attached is

2    a true and correct copy of said communication, referred to as "Exhibit 33."

3        146.    On July 17, 2024, Kurmangazy informs Plaintiffs that the only reason

4    they have not cancelled the transaction is due to their longstanding relation with

5    Mr. Almada. Kurmangazy states that they hope to receive the $450,000 payment

6    within the next 24 hours. (*See* Exhibit 32).

7        147.    Around July 17, 2024, Mr. Juan and Mr. Almada continue to reassure

8    Plaintiffs that they can get Arenda, Kurmangazy, and RosEst to wait for the

9    $450,000 to come-in.

10       148.    Around July 18, 2024, Plaintiffs through Mr. Juan and Mr. Almada

11   inform Kurmangazy, based on Mr. Martinez's and A&A's representations, that our

12   final buyer will make the payment of the 450,000 dollars.

13       149.    On July 25, 2024,  Plaintiffs email Kurmangazy that: (i) Plaintiffs have

14   buyers for both of the A1 and EN590 but the buyer of the A1 is stating that the

15   product does not actually exist within RosEst's tankers so the buyers are calling

16   Plaintiffs scammers now; (ii) that it might be okay if the A1 has already been sold,

17   but they want confirmation that the EN590 actually exists through "an (ATV) to

18   verify that product" and then the buyers can provide the $450,000.00; & (iii)

19   Plaintiffs reiterated that delays were due to the buyers not wanting to provide liquid

20   cash without an ATV / proof of product. Attached is a true and correct copy of said

21   communications, referred to as "Exhibit 34."

22       150.    On July 29, 2024, Kurmangazy's response to Plaintiffs' email on July

23   25, 2024, was that: "we can only issue the (ATV) and POP Documents + Fresh SGS

24   Report after our bank must have confirmed your outstanding agreed payment of

25   $450,000 USD." Kurmangazy attached an Invoice No. LLPKP00944739 with

26   payment to go to Global Logistics Storage, LLC. Attached is a true and correct copy

27   of Invoice No. LLPKP00944739, referred to as "Exhibit 52." (*See Also* Exhibit 34).

28

151.    Sometime around July 30, 2024, Plaintiffs conduct due diligence into Kurmangazy's stated beneficiary for $450,000, the organization Terminal. Plaintiffs realize that the entity is known for fraud associated with Mr. Auyeung.

152.    At this point, Plaintiffs realize that Kurmangazy might be a fraudulent shell organization tied to Mr. Auyeung, but are still unaware of the other Defendants' involvement and the status of Arenda or RosEst as fraudulent entities.

153.    Plaintiffs hired Mgi Chambonett y Asociados a/k/a MGI Worldwide ("MGI") to conduct a swift independent due diligence investigation and a report was produced to Plaintiffs on July 30, 2024 (the "MGI Report"). Attached is a true and correct copy of said MGI Report, referred to as "Exhibit 35."

154.    The MGI Report informed Plaintiffs that:

155.    (i) Arenda was a fake entity based off of an inactive Russian organization created to present the false narrative that Kurmangazy is a legitimate refinery;

156.    (ii) LLP Kurmangazy Petroleum was a fake entity created to imitate a real Russian entity named Kurmangazy Petroleum TOO;

157.    (iii) Kurmangazy's banking information that was provided to Plaintiffs for its' bank 'First Heartland Jusan Bank,' including the domain https://jusaninvest.kz/ru, were fake. The real domain for First Heartland Jusan Bank is here: https://jusan.kz/en;

158.    (iv) Plaintiffs were informed that Kurmangazy's banking information actually went to First Neartland Jusan Invest, AO, which has transactional ties to Terminal Logistics International Escrow Services, LLC;

159.    and (v) Sea Forest International, LLC, Apex Oil and Gas Trading, LLC, Navigator Energy Logistics, LLC, and Terminal Logistics International Escrow Service, LLC are all connected to Mr. Auyeung.

160.    Plaintiffs conducted further due diligence on its own initiative after receiving the MGI Report and found that:

161.    (i) Mr. Baktigalievich does not appear to exist outside of a scam alert online;

162.    (ii) the only other listed director of Kurmangazy was a Khozhalepes Tazhimanovich Elevsinov – who's identity equally could not be verified;

163.    (iii) Ms. Afasyovena's identity could not be confirmed and appears to be a nonexistent individual as well;

164.    (iv) Mr. Vladimirovich's identity could not be confirmed and appears to be a nonexistent individual as well;

165.    and (v) based on the MGI Report and Plaintiffs' due diligence, nearly everyone introduced by Mr. Juan and Mr. Almada to Plaintiffs, were fake entities and individuals, and everyone introduced were accomplices in perpetuating intricate commodities frauds.

166.    On August 1, 2024, Invoice No. LLPKP00944799 was issued by LLP Kurmangazy Petroleum in relation to Commercial Invoice No.'s: KPKAZA/EN590/6987635/SBANV KPKAZA [50,000 MT on April 29, 2024] & JETFUELA1/9374874654/SBANV [2,000,000 BBLs on April 30, 2024] for an amount of $450,000.00 to Global Logistics Storage, LLC. Attached is a true and correct copy of Invoice No. LLPKP00944799, referred to as "Exhibit 53."

167.    Around August 1, 2024, Plaintiffs now understand that the entities and individuals they have been introduced to by Mr. Juan and Mr. Almada have previously conducted fraud, but Plaintiffs as a last-ditch effort decide to try and resolve the matter peacefully in hopes of acquiring the EN590 and A1.

168.    Around August 1, 2024, Plaintiffs now also come to realize that Mr. Juan has likely utilized his longstanding friendship with Mr. Cruz to set this intricate fraud into motion and brought Mr. Almada into the mix to help facilitate everything.

169.    Around August 2, 2024, Plaintiffs reiterate to Kurmangazy that they need proof of product and the terms of the executed CI's / ICPO's establish this

should occur after the initial injection payments were made with no 'delay or penalty' payments agreed to occur. Plaintiffs discuss how their due diligence recently informed them that RosEst's accounts are linked to Mr. Auyeung who is wanted for fuel fraud within the U.S. and that Plaintiffs may provide a payment if the existence of the products can be undeniably verified. Kurmangazy responds by stating: "We shall discuss with your tank farm on how to evacuate our products asap." Attached is a true and correct copy of said communications, referred to as "Exhibit 36."

170.    Around August 2, 2024, Plaintiffs make a demand to receive the monies they have paid back.

171.    On August 5, 2024, a "Pre-Tarmination Order" (Ref. No. KAZA-94875087743-7947) was sent by LLP Kurmangazy Petroleum to Plaintiffs pertaining to EN590-10PPM-50,000MT and Jet Fuel A1-2,000,000 BBLs. Kurmangazy stated that they will divert the assets to a standby buyer(s) and that Plaintiffs have up to and until August 10, 2024, to provide a payment slip accordingly. Attached is a true and correct copy of the 'Pre-T[e]rmination Order,' referred to as "Exhibit 54."

172.    On August 12, 2024, an Invoice No. LLPKP019670026 was issued by LLP Kurmangazy Petroleum in relation to Commercial Invoice No.'s: KPKAZA/EN590/6987635/SBANV [50,000 MT on April 29, 2024] & KPKAZA/JETFUELA1/9374874654/SBANV [2,000,000 BBLs on April 30, 2024] for an amount of $450,000.00 to be paid solely by A&A Energy Oil and Gas, LLC to Terminal Logistics International Escrow Service, LLC. Attached is a true and correct copy of Invoice No. LLPKP019670026, referred to as "Exhibit 55."

173.    On August 13, 2024, an Invoice No. LLPKP019670027 was issued by LLP Kurmangazy Petroleum in relation to Commercial Invoice No.'s: KPKAZA/EN590/6987635/SBANV [50,000 MT on April 29, 2024] & KPKAZA/JETFUELA1/9374874654/SBANV [2,000,000 BBLs on April 30, 2024] for

an amount of $450,000.00 with A&A Energy Oil and Gas, LLC participating in the transaction to Southern Logistics Financial, Inc. Attached is a true and correct copy of Invoice No. LLPKP019670027, referred to as "Exhibit 56."

174.    All communications from Arenda, Kurmangazy, and RosEst have ceased as of August 13, 2024.

175.    $1,044,132 were paid by Plaintiffs to Defendants' accounts for these transactions and Plaintiffs never received any EN590 nor A1, which accounts for part of the damages herein.

176.    Neither the ICPO's, Commercial Invoices, nor TSA's had clauses which would cancel the agreements outright due to an untimely payment.

177.    Plaintiffs' reliance on the Defendants' representations and promises led them to suffer damages.

178.    On information and belief, Arenda is an inactive Russian entity designed solely to legitimize the fictitious organization Kurmangazy for the other Defendants.

179.    On information and belief, Kurmangazy is a fictitious oil refinery utilized by the Defendants to conduct fraud and money laundering.

180.    On information and belief, RosEst is a fictitious tank storage farm that has been blacklisted from the port of Rotterdam, Netherlands, and is utilized by the Defendants to conduct fraud and money laundering.

181.    On information and belief, Sea Forest, Navigator Energy, Terminal, and Apex, are all shell organizations utilized by Mr. Auyeung to perpetuate frauds.

182.    Despite Defendants abhorrent payment scheme, Plaintiffs, through counsel, made further efforts around August 2024 to convince Defendants to reimburse Plaintiffs or provide the EN590 and A1, to no avail.

183.    Given the above, it is clear that Defendants all were serving as 'sellers' and working together in the fraudulent transactions to Plaintiffs as 'buyers.'

184.    Mr. Auyeung, through Navigator Energy, Terminal, and Apex, has been indicted in the United States District Court for the Western District of Washington, Case No. CR24-145-JCC, with trial to commence based on "conspiracy to commit money laundering," "money laundering – concealment," and "money laundering – spending." Attached is a true and correct copy of said Indictment, referred to as "Exhibit 57."

185.    The United States Attorney's Office for the Western District of Washington claims that: "From at least August 2022 through August 2024, the co-schemers convinced victims to send money to what was represented as escrow accounts to purchase oil tank storage in either Rotterdam, Netherlands, or Houston. The schemers indicated that the investors could make significant profits by renting the oil tank storage they obtained to others. However, once the funds came into accounts controlled by Auyeung, the money was quickly moved into other accounts, moved offshore, or was used for the purchase of cryptocurrencies, including Bitcoin, Tether, USD Coin, and Ethereum, via cryptocurrency exchanges such as Gemini, BitStamp, and Coinbase. Much of the cryptocurrency was further transferred to accounts at the cryptocurrency exchange Binance. Victims were not sent any further information on their investment and Auyeung and others simply stopped responding." (*See* Press Release – "Seattle area resident indicted for laundering millions of dollars – alleged proceeds of wire fraud scheme," dated August 28, 2024). Attached is a true and correct copy of said Press Release, referred to as "Exhibit 58."

186.    Mr. Auyeung has had other lawsuits brought against him related to fraud within the oil commodities business.

187.    Plaintiffs allege the indictment, statements made by the Attorney's Office, and other lawsuits against Mr. Auyeung / his entities are relevant, not as impermissible character evidence, but as evidence admissible for another purpose pursuant to Fed. R. Evid. Section 404(b), i.e. proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident.

188.   Additionally, Fed. R. Evid. Section 406 states that "[e]vidence of a person's habit or an organization's routine practice may be admitted to prove that on a particular occasion the person or organization acted in accordance with the habit or routine practice. The court may admit this evidence regardless of whether it is corroborated or whether there was an eyewitness."

///

///

## FIRST CAUSE OF ACTION FOR BREACH OF CONTRACT

### (By Plaintiff Sun Bright Against Defendants A&A, Mr. Juan, Mr. Almada, & Does 1-10)

189.   Plaintiff restates and incorporates by reference paragraphs 1 through 188 as though fully stated herein.

190.   The parties all executed and entered into individual written agreements, (the "Agreement(s)" for purposes of this First, Second, Third, & Fourth Causes of Action), which are attached hereto as Exhibits 17, 18, 19, & 20.   The Agreements constitute valid and enforceable contracts.

191.   Pursuant to the Agreement with A&A in Exhibits 19 & 20, the contracting parties agreed that A&A would provide specified payments of $450,000 and, in return, Sun Bright would receive specified POP / SGS / EPC documents to provide A&A exclusively the alleged oil products that Sun Bright acquires at a to be negotiated price.

192.   Defendant A&A failed to pay RosEst and Kurmangazy $450,000 for POP / SGS / EPC documents to be renewed and, thus, materially breached the Agreement.

193.   Pursuant to the Agreements with Defendants Mr. Juan and Mr. Almada, Exhibits 17 & 18, (the "Commercial Alliance Agreements"), both of the Commercial Alliance Agreements at Section 1.2 call for the "incorporation of…new

Clients" to "generate the economic resources to pay the professional fees" to Mr. Juan and Mr. Almada.

194.   Both of the Commercial Alliance Agreements at Section 3.1 call for "FIFTEEN (15%) Net percent obtained from the profits" to Mr. Juan and Mr. Almada "in order to satisfy the demand of new "Clients" " while Mr. Juan and Mr. Almada serve "in [their] capacity as SALES DIRECTOR OF SUN BRIGHT ASSETS NV" and "DIRECTOR OF OPERATIONS."

195.   Both of the Commercial Alliance Agreements at Section 2.1 call for " "THE CONTRACTED PARTY" as either "SALES DIRECTOR OF SUN BRIGHT ASSETS NV" or "DIRECTOR OF OPERATIONS," "declares that he will have his own commercial and professional structure, which allow him to carry out, with his sole efforts, the commercial efforts entrusted by ("THE COMPANY CONTRACTING PARTY"), within the scope and content of this Commercial Agreement. This situation implies that, since the work of "THE CONTRACTED PARTY" will be rewarded in accordance with the provisions of the Third Clause of this of this Contractual Agreement, that is, according to the materialization of each commercial process through the corresponding Orders of Purchase issued by the "Clients" Customers" buyers…"

196.   Section 2.1 of the Commercial Alliance Agreements essentially is a guarantee on the part of Mr. Juan and Mr. Almada that they have a trustworthy proprietary structure to guarantee business transactions as contracted by Plaintiffs.

197.   Hence, the use of "own commercial and professional structure" was referring to the contacts Mr. Juan and Mr. Almada had told Plaintiffs would facilitate the underlying oil transactions, i.e. Arenda, Kurmangazy, RosEst, and the other Defendants that were involved therein by associating with the transaction.

198.   With this in mind, Section 2.1 put Mr. Juan and Mr. Almada into a position where they agreed to materialize real connections and/or "commercial process[es]" that they provide to Plaintiffs.

199. The words "which will allow him to carry out, with his sole efforts, the commercial efforts entrusted by ("THE COMPANY CONTRACTING PARTY")," found in Section 2.1, put into agreement the fact that Plaintiffs were relying on Mr. Juan and Mr. Almada to head the underlying oil transactions and direct the logistics herein on behalf of Plaintiffs.

200. Mr. Juan and Mr. Almada materially breached the Commercial Alliance Agreements, including both Sections 1.2, 2.1, and 3.1, by providing fraudulent misrepresentations and making material omissions and/or nondisclosures to Plaintiffs about the validity of all Defendants herein and facilitating Plaintiffs' payments to fake individuals and entities.

201. Sun Bright has at all times performed all, or substantially all, conditions, covenants, and promises required by it under the Agreements.

202. Sun Bright did not waive nor excuse Defendants' obligations under the Agreements.

203. Defendants never intended to honor their commitments under the Agreements and instead were working together to conduct a fraud on Plaintiffs.

204. As a direct, foreseeable, and proximate result of Defendants' breaches of their individual Agreements, Sun Bright has suffered, and continues to suffer, damages, the exact amount of which has not yet been fully ascertained but which is estimated to be at least $1,044,132.

205. Defendant Mr. Juan as a direct, foreseeable, and proximate result of his breaches, also caused Sun Bright an additional $10,700 in damages, an amount that was given as compensation to Mr. Juan before Sun Bright ascertained the breach of contract and encompassing fraud.

206. Defendant Mr. Almada as a direct, foreseeable, and proximate result of his breaches, also caused Sun Bright an additional $18,551.60 in damages, an amount that was given as compensation to Mr. Almada before Sun Bright ascertained the breach of contract and encompassing fraud.

207.   As far as this honorable Court deems any other causes of action superfluous, Plaintiff restates and incorporates by reference paragraphs 213 through 238, as grounds for its breach of contract claims.

**Allegations Related to California Choice-of-Law Governing Mr. Almada's and Mr. Juan's Contracts**

208.   Both Commercial Alliance Agreements at Section 9.1 state that: "This agreement will be deemed to have been signed and will be subject to International Arbitration at a location agreed upon by both parties, and in each case without regard to their choice of law principles."

209.   Mr. Juan and Mr. Almada were informed of Plaintiffs' intentions to sue and Sun Bright enforcing its rights under the Commercial Alliance Agreements.

210.   Both Mr. Juan and Mr. Almada refused to supply a location to arbitrate, rendering the international arbitration clause invalid herein, and stated that 'nothing could be done' to them.

211.   There is no other choice of law provision which directly governs the Commercial Alliance Agreements outside of Section 4.1 which calls for enforcement of Mr. Juan's and Mr. Almada's obligations "in the all countries of the wor[l]d."

212.   It was communicated to Mr. Juan and Mr. Almada that enforcement of the Commercial Alliance Agreements would occur in California based on: (i) the intent of the parties before executing the document to have Plaintiffs conduct anything related to the transactions out of Los Angeles, California; and (ii) California's interests to the underlying transaction and causes of action herein.

**SECOND CAUSE OF ACTION FOR BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING**

**(By Plaintiff Sun Bright against Defendant A&A, Mr. Juan, Mr. Almada, & Does 1-10)**

213.   Plaintiff restates and incorporates by reference paragraphs 1 through 188 as though fully stated herein.

214.    For the sake of brevity and clarity, Plaintiff restates and incorporates by reference paragraphs 189 through 206 as though fully stated herein and the damages that Plaintiffs' sustained.

215.    As far as Defendants believe that all conditions for their performance had occurred or were excused and therefore there was no breach of contract, Plaintiff nonetheless alleges that Defendants' conduct herein prevented Plaintiff from receiving the benefits under the Agreements and was a violation of the implied covenant of good faith and fair dealing.

216.    Pursuant to the Commercial Alliance Agreements at Section 1.1, Mr. Juan and Mr. Almada explicitly agreed to provide "extensive experience in corporate areas. of hydrocarbons, with extensive experience in commercial advice on hydrocarbon matters, incorporates its professional capabilities in order to generate, develop projects and businesses of energy trade, commodities and also obtain reliable and safe suppliers of Energy Products (commodities), to satisfy the demand of new "Clients" operationally constituted in the different countries of the wor[l]d."

217.    Pursuant to the Commercial Alliance Agreements at Section 2.3, Mr. Juan & Mr. Almada explicitly agreed that the "tasks entrusted" to them "will always be carried out with a scheme of saving time, money and resources in general, so that the objectives are achieved in the most effective and efficient way possible."

218.    The Agreements all contained an implied promise of good faith and fair dealing that requires Defendants to refrain from taking actions, or refusing to take actions, that unfairly interfere with the right of Sun Bright to receive the benefits of the contract.

219.    As a result of the parties' contract negotiations, Defendants knew that Sun Bright was relying upon their representations and if their Agreements were breached, Sun Bright would accrue substantial damages.

220.    Nevertheless, Defendant A&A proceeded to ignore its representations to pay $450,000, while all Defendants facilitated fraudulent transactions against

COMPLAINT

Plaintiff.  In so doing, Defendants A&A, Mr. Juan, and Mr. Almada knew this was not acceptable to Sun Bright and, therefore, acted in bad faith and unfairly interfered with Sun Bright's rights to receive the benefits of the Agreements.

221.   Plaintiff seeks any tort-related damages including punitives or exemplary damages which may be available herein. (*See Careau &Co. v. Security Pacific Business Credit, Inc.*, 222 Cal.App.3d 1371, 1394 – 1395 & fn.17 (1990)(opining how "the only justification for asserting a separate cause of action for breach of the implied covenant is to obtain a tort recovery" which "demonstrates a failure or refusal to discharge contractual responsibilities, prompted not by an honest mistake, bad judgment or negligence but rather by a conscious and deliberate act…").

## THIRD CAUSE OF ACTION FOR BREACH OF NON-DISCLOSURE AGREEMENT

### (By Plaintiff Sun Bright Against Defendants Mr. Juan, Mr. Almada, & Does 1-10)

222.   Plaintiff restates and incorporates by reference paragraphs 1 through 188 as though fully stated herein.

223.   For the sake of brevity and clarity, Plaintiff restates and incorporates by reference paragraphs 189 through 206 as though fully stated herein and the damages that Plaintiffs' sustained.

224.   Both Commercial Alliance Agreements defined Sun Bright as "The Contracting Company" and Mr. Juan and Mr. Almada as "The Contracted Party" or "The Contracted Company."

225.   Both Commercial Alliance Agreements in Sections 5.1 – 5.6 contain a Non-Disclosure Agreement.

226.   Section 5.1 in both Commercial Alliance Agreements states that "THE CONTRACTED COMPANY undertakes to protect and not use or reveal to third parties any information related to THE CONTRACTING COMPANY, and its

Products and developments, as well as the projects under development or that are in the process of being implemented. negotiation and/or formalization." The Section goes onto define "Confidential Information" to include "any information, developed and in reference to the CONTRACTING COMPANY's own, specific and particular businesses, as well as those related to its products, projects and any other information that confers this company an advantage with respect to its competitors who do not have such information; including, but not limited to, trade secrets, marketing and expansion projects, promotion and/or sales plans, investment strategies, product design, technical specifications, methods, systems, processes, technology, personnel information, statistics, budgets, costs, financial data, contracts, policies, correspondence, names and lists of clients, former clients and/or suppliers, and any other property or information related to this company and its businesses, or that it has decided to classify as confidential at any time. moment."

227.    Sections 5.2 – 5.6 in both Commercial Alliance Agreements state that "In exercising this confidentiality commitment, THE CONTRACTED PARTY must: 5.2 Use the same level of effort as you use to protect, safeguard and not disclose your own confidential information to third parties. 5.3 Refrain from using the Confidential Information during the time indicated in this Contract. 5.4 Not reveal, use or allow third parties to have access to Confidential Information, except with the prior, express and written consent of THE CONTRACTING COMPANY. 5.5 Do not copy or reproduce by any method or under any circumstances, any document containing Confidential Information. 5.6 Inform or notify the CONTRACTING COMPANY, immediately, of any requirement from any administrative or judicial authority requesting the disclosure of Confidential Information."

228.    Mr. Juan and Mr. Almada breached their obligations herein by communicating Confidential Information, including but not limited to, "marketing and expansion projects," "investment strategies," "budgets, costs, [and] financial

1    data" to the other Defendants or at the very least by utilizing said Confidential
2    Information to facilitate a fraud against Plaintiffs.

3        229.   Plaintiff further seeks any tort-related damages including punitives or
4    exemplary damages which may be available herein.

5    **FOURTH CAUSE OF ACTION FOR BREACH OF PARTNERSHIP**
6    **AGREEMENT**

7    **(By Plaintiff Sun Bright Against Defendants Mr. Juan, Mr. Almada, &**
8    **Does 1-10)**

9        230.   Plaintiff restates and incorporates by reference paragraphs 1 through
10    188 as though fully stated herein.

11        231.   Plaintiff restates and incorporates by reference paragraphs 189
12    through 206 as though fully stated herein and the damages that Plaintiffs'
13    sustained.

14        232.   The intent of the Commercial Alliance Agreements was to create a
15    partnership, stated as a "commercial ALLIANCE" between Sun Bright, Mr. Juan,
16    and Mr. Almada.[2]

17        233.   The first ten words of the Commercial Alliance Agreements is: "This
18    Partnership Agreement ("Agreement") is entered into as of today…"

19        234.   As shown from the above, Mr. Juan and Mr. Almada approached Sun
20    Bright with a business proposal.

21        235.   Mr. Juan and Mr. Almada were meant to share in the management
22    and control of the business while facilitating the business proposal and acting as
23    "Sales Director of Sun Bright Assets NV" and "Director of Operations."

24

---

[2] In California, partnership agreements do not need to be in writing. (*See* Cal. Corp. Code §
25    16202)(defining a partnership as "the association of two or more persons to carry on as
coowners of a business for profit…")). Courts have instead looked to the intent and conduct
26    of the parties. (*See Holmes v. Learner*, 74 Cal.App.4th 442, 453 - 457 (1999); *See Also
DeMartini v. DeMartini*, 833 Fed. Appx. 128, 130–31 (2020) (finding that a partnership
27    existed based on an oral agreement and the conduct of the parties). Moreover, the sharing
of profits and losses may be evidence that a partnership exists, but it is not a prerequisite
28    to formation. (*See Holmes, supra*, 74 Cal. App. 4th at 456 - 457 (finding that profit sharing
is evidence that a partnership exists and not an "indispensable element" of formation).

236.    Mr. Juan and Mr. Almada agreed to percentages of the net profits generated in furtherance of the business proposal as partners.

237.    Mr. Juan and Mr. Almada are explicitly stated to not be employees nor independent contractors of Sun Bright in Section 2.4 of the Commercial Alliance Agreements: "**None of the parties will act with respect to the other under a relationship of dependency, subordination or hierarchy,** therefore, between them, their representatives and/or employees there is not, nor will there be, the intention to stimulate or maintain a relationship that could be classified as labor."[3] (emphasis added).

238.    Both of the Commercial Alliance Agreements at Section 2.5 state that "Between both parties there exists and will exist, at all times, absolute independence and autonomy in making their respective decisions. **The contractual relationship that is being established with the signing of this document is and will always be a commercial ALLIANCE in the field of hydrocarbons**..." (emphasis added).

## <u>FIFTH CAUSE OF ACTION FOR BREACH OF FIDUCIARY DUTIES</u>

### (By Plaintiff Sun Bright Against Defendants Mr. Auyeung, Mr. Juan, Mr. Almada, Sea Forest, Navigator Energy, Terminal, & Apex, and Does 1-10)

239.    Plaintiff restates and incorporates by reference paragraphs 1 through 188 as though fully stated herein.

240.    Plaintiff for the sake of brevity and clarity restates and incorporates by reference paragraphs 230 through 238 as though fully stated herein and the damages that Plaintiffs sustained by reference paragraphs 204 through 206.

---

[3] *See* Cal. Corp. Code § 16202(c)(3)(B), describing how "A person who receives a share of the profits of a business is presumed to be a partner in the business, unless the profits were received for any of the following reasons: In payment for services as an independent contractor or of wages or other compensation to an employee."

241. Mr. Juan and Mr. Almada owed Sun Bright fiduciary duties as partners in a business proposal, including but not limited to the duty of loyalty, care, and confidentiality.[4]

242. Mr. Juan and Mr. Almada breached their fiduciary duties by committing and facilitating the causes of actions against Plaintiff stated herein.

243. As for Mr. Auyeung, Sea Forest, Navigator Energy, Terminal, and Apex, it was not only understood that they would be acting as an intermediary escrow between Kurmangazy and Sun Bright, but the fake agreements that were executed specifically reference the Buyer making payments to an intermediary with Seller then transferring title.

244. The ICPO's called in Section 6 called for: "Buyer makes 100% payment within 48-72 working hours for the first trial lift able via TT Wire Transfer MT103, Seller Transfer Ownership title to Buyer."

245. The Commercial Invoices in Sections 3 & 6 state that: "3. Buyer also pays both nominated Tank Storage Facility for 2 days [3 days for other invoice] after Buyer's tank Farm Company has received payment from the Seller Company[;]…6. Seller transfer the title of ownership as per Buyer's instruction. Buyer lifts the Product…"

246. The TSA's in Section 6.2 call for "6.2 The LESSEE shall pay for the Ex-Shore Tank to be use **in receiving and storing petroleum** product in European Union currency through the means of SWIFT MT103-T/T directly **into the Fiduciary/ Onshore or Nominated Bank Account provided in the Invoice as issued to the LESSEE Company by the LESSOR** duly sign and Seal the General Director. {**Note that this is as result ofWestern Countries Sanctions on some banks in Russia**}." (emphasis added). Meaning, between the ICPO's, Commercial Invoices, and TSA's, it was understood that Sun Bright would pay

---

[4] To succeed on a breach of fiduciary duty claim in California, a plaintiff must establish the existence of a fiduciary relationship, breach of that duty, and damages. (*See Charnay v. Cobert*, 145 Cal. App. 4th 170, 182 (2006)). Partners owe fiduciary duties to the other partner(s) and to the partnership itself. (*See* Cal. Corp. Code § 16404).

Kurmangazy for the oil products through the "Fiduciary" and "Nominated Bank Account" provided by "LESSOR" – RosEst, who would serve as the intermediary escrow herein. This structure was allegedly chosen due to sanctions on Russian banks, so when RosEst provided the accounts of the WA LLC Defendants to serve as escrow, Plaintiffs conducted said transactions.[5]

247.    Given Mr. Auyeung was acting on behalf of Sea Forest, Navigator Energy, Terminal, & Apex, which may very well be shell organizations, Mr. Auyeung was truly the individual who owed fiduciary duties to Plaintiff Sun Bright as well and would be acting as escrow.

## SIXTH CAUSE OF ACTION FOR FRAUD

**(By Plaintiffs Sun Bright & Sun Bright USA Against Defendants Mr. Auyeung, Sea Forest, Navigator Energy, Terminal, Apex, Mr. Juan, Mr. Almada, A&A, Mr. Martinez, & Does 1-10)**

248.    Plaintiff restates and incorporates by reference paragraphs 1 through 188 as though fully stated herein.

249.    Mr. Juan and Mr. Almada made false representations on numerous occasions to Plaintiffs' staff, including Ramon Jimenez ("Mr. Jimenez") serving as legal counsel, Catherina A. Bullen ("Ms. Bullen") serving as a legal clerk, and Mr. Cruz as CEO, that Arenda, Kurmangazy, and RosEst were reputable and non-fraudulent organizations which routinely conduct oil transactions.

250.    Mr. Juan and Mr. Almada made false representations to Plaintiffs' staff on numerous occasions that they had successfully conducted prior oil transactions with Arenda, Kurmangazy, and RosEst beforehand.

251.    Mr. Juan and Mr. Almada made false representations to Plaintiffs' staff on numerous occasions that Plaintiffs' Confidential Information would not be

---

[5] "An escrow holder has a fiduciary duty to the escrow parties to comply strictly with the parties' instructions. The holder only assumes this duty by agreeing to execute the escrow. The obligation to exercise reasonable skill and diligence in carrying out the escrow instructions, and to comply strictly with the depositor's written instructions are within the duties undertaken in the contract." (*Kangarlou v. Progressive Title Co., Inc.*, 128 Cal.App.4th 1174, 1179 (2005)(internal citation omitted)).

utilized against them and that proper due diligence had been conducted into Arenda, Kurmganzay, and RosEst to further the agreed business proposal that the duo brought to Plaintiffs.

252.    Mr. Juan and Mr. Almada falsely represented to Plaintiffs on two occasions at least that A&A and Mr. Martinez had conducted successful oil transactions with Arenda, Kurmangazy, and RosEst.

253.    As such, Mr. Juan and Mr. Almada ultimately concealed and non-disclosed that Arenda, Kurmangazy, and RosEst were fake entities designed to facilitate a fraud in connection with the other Defendants.

254.    Mr. Martinez, acting as an individual, and on behalf of A&A, provided false representations, in the form of verbal communications and screenshots, that he and A&A had previously conducted successful oil transactions with Arenda, Kurmangazy, and RosEst. These false representations were made to Plaintiffs' staff.

255.    As such, Mr. Martinez and A&A ultimately concealed and non-disclosed that Arenda, Kurmangazy, and RosEst were fake entities designed to facilitate a fraud in connection with the other Defendants.

256.    As noted within the General Factual Allegations, Arenda, Kurmangazy, and RosEst conducted communications, agreements, and multiple material non-disclosures onto Plaintiffs. Given these entities and the individuals who operate them appear to be fictitious currently, it stands to reason that the Defendants were working in concert as co-conspirators to conduct said communications, agreements, and nondisclosures of material facts.

257.    It also stands to reason that any information one Defendant was informed of that could be utilized to perpetrate the fraud herein, would be known or communicated to the other Defendants.

258.    The Defendants Mr. Auyeung, Sea Forest, Navigator Energy, Terminal, and Apex either participated in orchestrating the false representations from Arenda, Kurmangazy, and RosEst, or ultimately concealed and non-disclosed

that the Russian entities were fake and designed to facilitate a fraud in connection with the other Defendants.

259.    The Defendants Mr. Auyeung, Sea Forest, Navigator Energy, Terminal, and Apex either participated in orchestrating the false representations from Mr. Almada, Mr. Juan, Mr. Martinez, and A&A, or ultimately concealed and non-disclosed that the contemplated transactions were designed to facilitate a fraud in connection with the other Defendants.

260.    Mr, Auyeung is the sole individual who owns and operates Sea Forest, Navigator Energy, Terminal, and Apex, all of whom were serving as RosEst's designated beneficiary for payments and intermediary escrow for the transactions.

261.    Mr. Auyeung, Sea Forest, Navigator Energy, Terminal, and Apex all impliedly promised to conduct the services of a fiduciary in connection with the transactions at hand.

262.    As stated previously, Plaintiffs had conducted due diligence on their own, as well as, through Mr. Almada and Mr. Juan, before entering into negotiations with Arenda, Kurmangazy, and RosEst.

263.    As such, Plaintiffs reasonably relied upon the representations made by the Defendants.

264.    Once Plaintiffs realized that a fraud might be occurring after having provided $1,044,132 to facilitate the underlying transactions, Plaintiffs hired an independent auditing firm to conduct due diligence and recognized that they may be the victim of a fraud initially perpetrated by relying upon a long-standing eighteen-year friendship between Mr. Cruz and Mr. Juan.

265.    Defendants' promises, representations, and purposeful omissions, individually and through their co-conspirators, were not only known to be false at the time they were made or made recklessly without regard for their truth, but were intended for Plaintiffs to rely upon.

266.    Plaintiffs have not received a penny in return nor milligram of EN590 or A1. Defendants' refusal to provide Plaintiffs anything is far too significant to be a mere oversight and Plaintiffs' reasonable reliance on Defendants' conduct has been a substantial factor in Plaintiffs' harm.

267.    As a direct, foreseeable, and proximate result of Defendants' conduct, Plaintiff has suffered, and continues to suffer, damages, the exact amount of which has not yet been fully ascertained but which is estimated to be at least $1,044,132.

268.    Defendant Mr. Juan as a direct, foreseeable, and proximate result of his conduct also caused Sun Bright an additional $10,700 in damages, an amount that was given as compensation to Mr. Juan before Sun Bright ascertained the breach of contract and encompassing fraud.

269.    Defendant Mr. Almada as a direct, foreseeable, and proximate result of his conduct also caused Sun Bright an additional $18,551.60 in damages, an amount that was given as compensation to Mr. Almada before Sun Bright ascertained the breach of contract and encompassing fraud.

**SEVENTH CAUSE OF ACTION FOR FRAUDULENT CONCEALMENT**

**(By Plaintiffs Sun Bright & Sun Bright USA Against Defendants Mr. Auyeung, Sea Forest, Navigator Energy, Terminal, Apex, Mr. Juan, Mr. Almada, A&A, Mr. Martinez, & Does 1-10)**

270.    Plaintiff restates and incorporates by reference paragraphs 1 through 188 as though fully stated herein.

271.    For the sake of clarity and brevity, Plaintiffs plead the particular facts and incorporate by reference paragraphs 248 through 269 which discuss concealed and suppressed facts, intentional concealment on the part of Defendants, Plaintiffs being unaware of the concealed and suppressed facts, and the damages Plaintiffs sustained.

272.    For the sake of clarity and brevity, Plaintiffs allege that based on the facts mentioned above, there was a duty to disclose the material facts that were concealed and suppressed herein.[6]

273.    All Defendants herein concealed material facts to Plaintiffs.

## EIGHTH CAUSE OF ACTION FOR FALSE PROMISE

**(By Plaintiffs Sun Bright & Sun Bright USA Against Defendants Mr. Auyeung, Sea Forest, Navigator Energy, Terminal, Apex, Mr. Juan, Mr. Almada, A&A, Mr. Martinez, & Does 1-10)**

274.    Plaintiff restates and incorporates by reference paragraphs 1 through 188 as though fully stated herein.

275.    For the sake of clarity and brevity, Plaintiffs plead the particular facts and incorporate by reference paragraphs 248 through 269 which discuss concealed and suppressed facts, intentional concealment on the part of Defendants, Plaintiffs being unaware of the concealed and suppressed facts, and the damages Plaintiffs sustained.

276.    All Defendants herein made promises to Plaintiffs without an intent to perform and an intent to induce Plaintiffs to further the transactions at hand.

## NINTH CAUSE OF ACTION FOR INTENTIONAL MISREPRESENTATION

**(By Plaintiffs Sun Bright & Sun Bright USA Against Defendants Mr. Auyeung, Sea Forest, Navigator Energy, Terminal, Apex, Mr. Juan, Mr. Almada, A&A, & Mr. Martinez and Does 1-10)**

277.    Plaintiff restates and incorporates by reference paragraphs 1 through 188 as though fully stated herein.

278.    For the sake of clarity and brevity, Plaintiffs plead the particular facts and incorporate by reference paragraphs 248 through 269 which discuss concealed and suppressed facts, intentional concealment on the part of Defendants, Plaintiffs

---

[6] "A duty to disclose facts arises only when the parties are in a relationship that gives rise to the duty, such as ' "seller and buyer, employer and prospective employee, doctor and patient, or parties entering into any kind of contractual arrangement." ' " (*Shin v. Kong*, 80 Cal.App.4th 498, 509 (2000) (emphasis added)).

1  being unaware of the concealed and suppressed facts, and the damages that
2  Plaintiffs sustained.

3  **TENTH CAUSE OF ACTION FOR FRAUDULENT INDUCEMENT**

4  **(By Plaintiff Sun Bright Against Defendants Mr. Auyeung, Sea Forest,**

5  **Navigator Energy, Terminal, Apex, Mr. Juan, Mr. Almada, A&A, & Mr.**

6  **Martinez and Does 1-10)**

7  279.   Plaintiff restates and incorporates by reference paragraphs 1 through
8  188 as though fully stated herein.

9  280.   For the sake of clarity and brevity, Plaintiffs plead the particular facts
10  and incorporate by reference paragraphs 248 through 269 which discuss concealed
11  and suppressed facts, intentional concealment on the part of Defendants, Plaintiffs
12  being unaware of the concealed and suppressed facts, and the damages that
13  Plaintiffs sustained.

14  281.   All Defendants knew of the ICPO's, CI's, TSA's, and Commercial
15  Alliance Agreements, and participated in receiving Plaintiffs' consent to the
16  fraudulent transactions at hand.

17  **ELEVENTH CAUSE OF ACTION FOR NEGLIGENT**

18  **MISREPRESENTATION**

19  **(By Plaintiffs Sun Bright & Sun Bright USA Against Defendants Mr.**

20  **Auyeung, Sea Forest, Navigator Energy, Terminal, Apex, Mr. Juan, Mr.**

21  **Almada, A&A, Mr. Martinez, & Does 1-10)**

22  282.   Plaintiff restates and incorporates by reference paragraphs 1 through
23  188 as though fully stated herein.

24  283.   For the sake of clarity and brevity, Plaintiffs plead the particular facts
25  and incorporate by reference paragraphs 248 through 269 which discuss concealed
26  and suppressed facts, intentional concealment on the part of Defendants, Plaintiffs
27  being unaware of the concealed and suppressed facts, and the damages that
28  Plaintiffs sustained.

284.    If any Defendants were unaware of the fraud being perpetuated, they nonetheless were negligent in making representations to Plaintiffs that Arenda, Kurmangazy, RosEst, and the other Defendants, were trustworthy.

## TWELFTH CAUSE OF ACTION FOR INTENTIONAL INTERFERENCE WITH CONTRACTUAL RELATIONS

**(By Plaintiff Sun Bright Against Defendants Mr. Auyeung, Sea Forest, Navigator Energy, Terminal, Apex, Mr. Juan, Mr. Almada, A&A, & Mr. Martinez and Does 1-10)**

285.    Plaintiff restates and incorporates by reference paragraphs 1 through 188 as though fully stated herein.

286.    For the sake of clarity and brevity, Plaintiffs plead the particular facts and incorporate by reference paragraphs 248 through 269 which discuss concealed and suppressed facts, intentional concealment on the part of Defendants, Plaintiffs being unaware of the concealed and suppressed facts, and the damages that Plaintiffs sustained.

287.    Defendants Mr. Auyeung, Sea Forest, Navigator Energy, Terminal, and Apex all interfered with Sun Bright's contracts with Arendis, Kurmangazy, RosEst, Mr. Almada, Mr. Juan, and A&A by performing intentional misrepresentations, concealing material facts, perpetuating various types of fraud, and working in unison to orchestrate a civil conspiracy.

288.    Defendants Mr. Almada, Mr. Juan, Mr. Martinez, and A&A all interfered with Sun Bright's contracts with Arendis, Kurmangazy, RosEst, by performing intentional misrepresentations, concealing material facts, perpetuating various types of fraud, and working in unison to orchestrate a civil conspiracy.

289.    All Defendants had reason to know of the contracts between Plaintiff Sun Bright and various parties.

290.    All Defendants intended to disrupt the performance of the contracts or knew that disruption of performance was certain or substantially certain to occur.

291.   All Defendants' conduct prevented performance of the contracts or made performance more expensive or difficult, for instance, by perpetuating a fraud.

292.   Plaintiff Sun Bright was harmed by Defendants' conduct which was a substantial factor in causing Plaintiff's harm.

## THIRTEENTH CAUSE OF ACTION FOR INDUCING BREACH OF CONTRACT

**(By Plaintiff Sun Bright Against Defendants Mr. Auyeung, Sea Forest, Navigator Energy, Terminal, Apex, Mr. Juan, Mr. Almada, A&A, & Mr. Martinez and Does 1-10)**

293.   Plaintiff restates and incorporates by reference paragraphs 1 through 188 as though fully stated herein.

294.   For the sake of clarity and brevity, Plaintiffs plead the particular facts and incorporate by reference paragraphs 248 through 269 which discuss concealed and suppressed facts, intentional concealment on the part of Defendants, Plaintiffs being unaware of the concealed and suppressed facts, and the damages that Plaintiffs sustained.

295.   Defendants Mr. Auyeung, Sea Forest, Navigator Energy, Terminal, and Apex all interfered with Sun Bright's contracts with Arendis, Kurmangazy, RosEst, Mr. Almada, Mr. Juan, and A&A by performing intentional misrepresentations, concealing material facts, perpetuating various types of fraud, and working in unison to orchestrate a civil conspiracy.

296.   Defendants Mr. Almada, Mr. Juan, Mr. Martinez, and A&A all interfered with Sun Bright's contracts with Arendis, Kurmangazy, RosEst, by performing intentional misrepresentations, concealing material facts, perpetuating various types of fraud, and working in unison to orchestrate a civil conspiracy.

297.   All Defendants had reason to know of the contracts between Plaintiff Sun Bright and various parties.

COMPLAINT

298.    All Defendants intended to disrupt the performance of the contracts and cause a breach to occur.

299.    All Defendants' conduct caused a breach of the contracts to occur, for instance, by perpetuating a fraud.

300.    Plaintiff Sun Bright was harmed by Defendants' conduct which was a substantial factor in causing Plaintiff's harm.

**FOURTEENTH CAUSE OF ACTION FOR CONSTRUCTIVE FRAUD**

**(By Plaintiff Sun Bright Against Defendants Mr. Auyeung, Sea Forest, Navigator Energy, Terminal, Apex, Mr. Juan, & Mr. Almada, and Does 1-10)**

301.    Plaintiff restates and incorporates by reference paragraphs 1 through 188 as though fully stated herein.

302.    For the sake of clarity and brevity, Plaintiffs plead the particular facts and incorporate by reference paragraphs 239 through 247 which discuss concealed and suppressed facts, intentional concealment on the part of Defendants, Plaintiffs being unaware of the concealed and suppressed facts, and the damages that Plaintiffs sustained.

303.    The Defendants Mr. Juan and Mr. Almada owed fiduciary duties as partners within the business proposal they brought to Plaintiff Sun Bright.

304.    Mr. Auyeung and his shell organizations, Sea Forest, Navigator Energy, Terminal, and Apex, all owed fiduciary duties as the intermediary escrow agents for the underlying oil transactions.

305.    Although all Defendants were supposed to act on Plaintiff's behalf for the purpose of purchasing EN590 and A1 through Arendis, Kurmangazy, and RosEst, the Defendants knew or should have known that the underlying transactions were fraudulent.

306.    The Defendants misled Plaintiff by failing to disclose this information and provide Plaintiff with information that was accurate or complete.

1    307.    Plaintiff was harmed by Defendants' conduct which was a substantial

2    factor in causing Plaintiff's harm.

3    **FIFTEENTH CAUSE OF ACTION FOR CONVERSION**

4    **(By Plaintiffs Sun Bright & Sun Bright USA Against Defendants Mr.**

5    **Auyeung, Sea Forest, Navigator Energy, Terminal, Apex, Mr. Juan, Mr.**

6    **Almada, A&A, & Mr. Martinez and Does 1-10)**

7    308.    Plaintiffs restate and incorporates by reference paragraphs 1 through

8    188 as though fully stated herein.

9    309.    Defendants Mr. Auyeung, Sea Forest, Navigator Energy, & Apex all

10   knowingly and intentionally wrongfully exercised control over the personal property

11   of Plaintiffs in the amount of $1,044,132. The individual amount that each

12   Defendant acquired is unknown given Plaintiffs have a credible reason to believe

13   that Mr. Auyeung transfers funds once received. Moreover, Plaintiffs have evidence

14   that all Defendants likely work together in a civil conspiracy. Nonetheless, the

15   individual wires mentioned, by reference to paragraphs 67, 73, 85, 86, 96, & 98,

16   highlight that: (i) $104,000 was wired to Sea Forest; (ii) $312,000 in total was wired

17   to Navigator Logistics; and (iii) $628,132 in total was wired to Apex.

18   310.    Since Mr. Auyeung has a history of fraud, as alleged by the Washington

19   Attorney's Office, by reference paragraphs 184 through 186, Plaintiffs assume that

20   Mr. Auyeung has control over the finances herein.

21   311.    Defendants Terminal, Mr. Juan, Mr. Almada, A&A, & Mr. Martinez

22   all knowingly and intentionally wrongfully exercised control over the personal

23   property of Plaintiffs by working in unison with the other Defendants to acquire

24   $1,044,132 and benefit from this unlawful conversion. It is unknown whether the

25   funds herein have been dispersed.

26   312.    Defendant Mr. Juan was provided $10,700 individually, premised on a

27   fraud.

28

313.    Defendant Mr. Almada was provided $18,551.60 individually, premised on a fraud.

314.    Plaintiffs did not provide lawful consent to Defendants acquiring Plaintiffs' personal property as all consent was premised on fraud and/or material facts that Plaintiffs were not made aware of.

315.    Defendants have not only taken possession of the $1,044,132, but denied the return of such to Plaintiffs and prevented Plaintiffs from having access to such.

316.    Defendants have harmed Plaintiffs in the amount of $1,044,132 collectively, and an additional $10,700 by Defendant Mr. Juan, and an additional $18,551.60 by Defendant Mr. Almada.

317.    Defendants' conduct has been a substantial factor in this harm occurring.

## SIXTEENTH CAUSE OF ACTION FOR UNLAWFUL, UNFAIR, FRAUDULENT BUSINESS ACT OR PRACTICE, AND UNFAIR COMPETITION UNDER CALIFORNIA'S BUSINESS AND PROFESSIONS CODE SECTION 17200 ET SEQ.

**(By Plaintiffs Sun Bright & Sun Bright USA Against Defendants Mr. Auyeung, Sea Forest, Navigator Energy, Terminal, Apex, Mr. Juan, Mr. Almada, A&A, Mr. Martinez, & Does 1-10)**

318.    Plaintiff restates and incorporates by reference paragraphs 1 through 188 as though fully stated herein.

319.    As shown above, Defendants committed a fraud, intentional misrepresentation, concealment, false promise, fraudulent inducement, conversion, intentional interference with contractual relations, inducing breach of contract, breach of fiduciary duty, constructive fraud, and other fraudulent, unfair, or unlawful acts.[7]

---

[7] With this in mind, Defendants' conduct individually and collectively appears to have violated Cal. Penal Code § 496, which provides as follows: "a) Every person who buys or

320.    Defendants led to various economic injuries to Plaintiffs of $1,044,132, $10,700, and $18,551.60.

321.    Plaintiffs seeks restitutionary disgorgement as this honorable Court deems fair.[8]

## SEVENTEENTH CAUSE OF ACTION FOR SECURITIES FRAUD PURSUANT TO CALIFORNIA'S CORPORATIONS CODE SECTIONS 25400 ET SEQ. & 25500 ET SEQ.

**(By Plaintiffs Sun Bright & Sun Bright USA Against Defendants Mr. Auyeung, Sea Forest, Navigator Energy, Terminal, Apex, Mr. Juan, Mr. Almada, A&A, Mr. Martinez, & Does 1-10)**

322.    Plaintiff restates and incorporates by reference paragraphs 1 through 188 as though fully stated herein.

323.    For the sake of clarity and brevity, Plaintiffs plead the particular facts and incorporate by reference paragraphs 248 through 269 which discuss concealed and suppressed facts, intentional concealment on the part of Defendants, Plaintiffs being unaware of the concealed and suppressed facts, and the damages that Plaintiffs sustained.

---

receives any property that has been stolen or that has been obtained in any manner constituting theft or extortion, knowing the property to be so stolen or obtained, or who conceals, sells, withholds, or aids in concealing, selling, or withholding any property from the owner, knowing the property to be so stolen or obtained, shall be punished by imprisonment in a county jail for not more than one year, or imprisonment pursuant to subdivision (h) of Section 1170… (c) Any person who has been injured by a violation of subdivision (a) or (b) may bring an action for three times the amount of actual damages, if any, sustained by the plaintiff, costs of suit, and reasonable attorney's fees."

[8] (*See Chowning v. Kohl's Dep't Stores, Inc.*, No. 16-56272, at *7 (9th Cir. Jul. 31, 2018): "Under California law, there are two forms of disgorgement: "restitutionary disgorgement, which focuses on the plaintiff's loss, and nonrestitutionary disgorgement, which focuses on the defendant's unjust enrichment." *In re Tobacco Cases II*, 192 Cal. Rptr. 3d at 899 (*quoting Meister v. Mensinger*, 178 Cal. Rptr. 3d 604, 618 (Cal. Ct. App. 2014)). Nonrestitutionary disgorgement is unavailable in UCL actions. *Id.* (citations omitted). Therefore, since the focus is on Chowning's loss, the appropriate calculation for restitution is the traditional restitution formula articulated *supra*.").

324.    Defendants worked together to fulfill the purpose of creating a false and/or misleading appearance of active trading in oil securities to affect a transaction which involved no change in the beneficial ownership thereof.

325.    Defendants made false and/or misleading statements and omissions of material fact, which at the time and in the light of the circumstances under which they were made, Defendants knew or had reasonable ground to believe were so false or misleading.

326.    Each Defendant had knowledge and conduct which directly or indirectly controlled and induced Plaintiffs to participate in the underlying transactions.

327.    Plaintiff seeks damages in accordance with Cal. Corp. Code Section 25500, which provides that "[a]ny person who willfully participates in any act or transaction in violation of Section 25400 shall be liable to any other person who purchases or sells any security at a price which was affected by such act or transaction for the damages sustained by the latter as a result of such act or transaction."

328.    Plaintiff also seeks rescission if the goods are still held and/or in the alternative, damages if not, in accordance with Cal. Corp. Code Section 25501, which provides that "[a]ny person who violates Section 25401 shall be liable to the person who purchases a security from, or sells a security to, that person, who may sue either for rescission or for damages…Upon rescission, a purchaser may recover the consideration paid for the security, plus interest at the legal rate, less the amount of any income received on the security, upon tender of the security."

329.    Plaintiff also seeks relief in accordance with Cal. Corp. Code Section 25504, which provides that "[e]very person who directly or indirectly controls a person liable under Section 25501 or 25503, every partner in a firm so liable, every principal executive officer or director of a corporation so liable, every person occupying a similar status or performing similar functions, every employee of a

person so liable who materially aids in the act or transaction constituting the violation, and every broker-dealer or agent who materially aids in the act or transaction constituting the violation, are also liable jointly and severally with and to the same extent as such person, unless the other person who is so liable had no knowledge of or reasonable grounds to believe in the existence of the facts by reason of which the liability is alleged to exist."

## EIGHTEENTH CAUSE OF ACTION FOR CONSPIRACY

**(By Plaintiffs Sun Bright & Sun Bright USA Against Defendants Mr. Auyeung, Sea Forest, Navigator Energy, Terminal, Apex, Mr. Juan, Mr. Almada, A&A, Mr. Martinez, & Does 1-10)**

330.    Plaintiff restates and incorporates by reference paragraphs 1 through 188 as though fully stated herein.

331.    For the sake of clarity and brevity, Plaintiffs plead the particular facts and incorporate by reference paragraphs 248 through 269 which discuss concealed and suppressed facts, intentional concealment on the part of Defendants, Plaintiffs being unaware of the concealed and suppressed facts, and the damages Plaintiffs sustained.

332.    There was an agreement implied by the conduct of Defendants to perpetuate a fraud, intentional misrepresentation, concealment, false promise, fraudulent inducement, conversion, intentional interference with contractual relations, inducing breach of contract, breach of fiduciary duty, constructive fraud, California securities fraud, a violation of California's UCL, and aiding and abetting to ultimately commit these wrongful acts on Plaintiffs.

333.    All Defendants were aware that the other Defendants, i.e. their coconspirators, planned to commit these wrongful acts on Plaintiffs.

334.    All Defendants agreed with their coconspirators and intended that the wrongful acts be committed and took steps to cooperate in fulfillment of this conspiracy.

## NINETEENTH CAUSE OF ACTION FOR AIDING & ABETTING

**(By Plaintiffs Sun Bright & Sun Bright USA Against Defendants Mr. Auyeung, Sea Forest, Navigator Energy, Terminal, Apex, Mr. Juan, Mr. Almada, A&A, Mr. Martinez, & Does 1-10)**

335.    Plaintiff restates and incorporates by reference paragraphs 1 through 188 as though fully stated herein.

336.    For the sake of clarity and brevity, Plaintiffs plead the particular facts and incorporate by reference paragraphs 330 through 334 which discuss concealed and suppressed facts, intentional concealment on the part of Defendants, Plaintiffs being unaware of the concealed and suppressed facts, and the damages that Plaintiffs sustained.

337.    Defendants knew that these various torts and wrongful acts were going to be committed against Plaintiffs.

338.    Defendants gave substantial assistance or encouragement in conducting the various torts and wrongful acts against Plaintiffs.

339.    Defendants' conduct was a substantial factor in Plaintiffs' harm

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs respectfully request entry of an award against Defendants as follows:

## AS TO THE FIRST & SECOND CAUSES OF ACTION

1.    For the Court to enter judgment for Plaintiff Sun Bright and against Defendants A&A, Mr. Juan, and Mr. Almada on the first and second claims for relief;

2.    For damages in an amount to be proven at trial of at least $1,044,132 against Defendants A&A, Mr. Juan, and Mr. Almada and any additional damages according to proof;

3.    For additional damages in an amount to be proven at trial of at least $10,700 against Defendant Mr. Juan;

4.      For additional damages in an amount to be proven at trial of at least $18,551.60 against Defendant Mr. Almada;

5.      For punitive damages;

6.      For attorneys' fees and costs, in an amount according to proof, as authorized by law;

### AS TO THE THIRD & FOURTH CAUSES OF ACTION

1.      For the Court to enter judgment for Plaintiff Sun Bright and against Defendants Mr. Juan and Mr. Almada on the third and fourth claims for relief;

2.      For damages in an amount to be proven at trial of at least $1,044,132 against Defendants Mr. Juan and Mr. Almada and any additional damages according to proof;

3.      For additional damages in an amount to be proven at trial of at least $10,700 against Defendant Mr. Juan;

4.      For additional damages in an amount to be proven at trial of at least $18,551.60 against Defendant Mr. Almada;

5.      For punitive damages;

6.      For attorneys' fees and costs, in an amount according to proof, as authorized by law;

### AS TO THE FIFTH & FOURTEENTH CAUSES OF ACTION

1.      For the Court to enter judgment for Plaintiff Sun Bright and against Defendants Mr. Auyeung, Mr. Juan, Mr. Almada, Sea Forest, Navigator Energy, Terminal, and Apex on the fifth and fourteenth claims for relief;

2.      For damages in an amount to be proven at trial of at least $1,044,132 against Defendants Mr. Auyeung, Mr. Juan, Mr. Almada, Sea Forest, Navigator Energy, Terminal, and Apex, and any additional damages according to proof;

3.      For additional damages in an amount to be proven at trial of at least $10,700 against Defendant Mr. Juan;

COMPLAINT

4.    For additional damages in an amount to be proven at trial of at least $18,551.60 against Defendant Mr. Almada;

5.    For punitive damages;

6.    For attorneys' fees and costs, in an amount according to proof, as authorized by law;

**AS TO THE SIXTH, SEVENTH, EIGHTH, NINTH, ELEVENTH, FIFTEENTH, EIGHTEENTH, & NINETEENTH CAUSES OF ACTION**

1.    For the Court to enter judgment for Plaintiffs and against all Defendants on the sixth, seventh, eighth, ninth, eleventh, fifteenth, eighteenth, and nineteenth claims for relief;

2.    For damages in an amount to be proven at trial of at least $1,044,132 against all Defendants and any additional damages according to proof;

3.    For additional damages in an amount to be proven at trial of at least $10,700 against Defendant Mr. Juan;

4.    For additional damages in an amount to be proven at trial of at least $18,551.60 against Defendant Mr. Almada;

5.    For punitive damages;

6.    For joint and several liability due to a civil conspiracy or aiding and abetting;

7.    For attorneys' fees and costs, in an amount according to proof, as authorized by law;

**AS TO THE TENTH, TWELFTH, & THIRTEENTH CAUSES OF ACTION**

1.    For the Court to enter judgment for Plaintiff Sun Bright and against all Defendants on the tenth, twelfth, and thirteenth claims for relief;

2.    For damages in an amount to be proven at trial of at least $1,044,132 against all Defendants and any additional damages according to proof;

COMPLAINT

3.    For additional damages in an amount to be proven at trial of at least $10,700 against Defendant Mr. Juan;

4.    For additional damages in an amount to be proven at trial of at least $18,551.60 against Defendant Mr. Almada;

5.    For punitive damages;

6.    For attorneys' fees and costs, in an amount according to proof, as authorized by law;

## AS TO THE SIXTEENTH CAUSE OF ACTION

1.    For the Court to enter judgment for Plaintiffs and against all Defendants on the sixteenth claim for relief;

2.    For restitutionary disgorgement;

3.    For punitive damages;

4.    For attorneys' fees and costs, in an amount according to proof, as authorized by law;

## AS TO THE SEVENTEENTH CAUSE OF ACTION

1.    For the Court to enter judgment for Plaintiffs and against all Defendants on the seventeenth claim for relief;

2.    For damages in an amount to be proven at trial of at least $1,044,132 against all Defendants and any additional damages according to proof;

3.    For additional damages in an amount to be proven at trial of at least $10,700 against Defendant Mr. Juan;

4.    For additional damages in an amount to be proven at trial of at least $18,551.60 against Defendant Mr. Almada;

5.    For statutory damages;

6.    For rescission in lieu of certain statutory damages under Cal. Corp. Code Section 25501, if the facts warrant such;

7.    For punitive damages;

COMPLAINT

8.    For attorneys' fees and costs, in an amount according to proof, as authorized by law;

## **AS TO ALL CAUSES OF ACTION**

1.    For prejudgment interest according to law; and

2.    For such other and further relief, including equitable relief, as the court may deem just and proper.

Date: November 26, 2024             GERARD FOX LAW P.C.

By: _____

Gerard P. Fox
Attorney for Plaintiffs
Sun Bright Assets N.V. &
Sun Bright (USA) Inc.